GEORGE SEEWALD, RESPONDENT v. W. H. GENTRY, APPELLANT.*

In the Springfield Court of Appeals. Opinion filed July 23, 1926.

**1.—Physicians and Surgeons—Malpractice.** Patient cannot recover for malpractice, however severe his suffering, and injury sustained, unless physician breached duty to him.

**2.—Same—Same—Degree of Skill Required of Physician.** A physician or surgeon is only required to possess or exercise that degree of skill and learning ordinarily possessed and exercised by the members of his profession in good standing, and it is his duty to use reasonable care and dili-

gence in the exercise of his skill and the application of his learning, and to act according to his best judgment.

**3.—Trial—Demurrer—Rule Required in Considering Demurrer.** On demurrer, all the evidence tending to support plaintiff's case is accepted as true, unless it should appear to be wholly counter to well-known physical laws or contrary to common experience, while defendant's evidence is treated as untrue, except that which may tend to support plaintiff's case.

**4.—Physicians and Surgeons—Malpractice.** Physician's failure to use suitable and sufficient padding over patient's foot in applying shoe arrangement after setting broken leg held for jury.

**5.—Evidence—Physicians and Surgeons—Malpractice—Expert Testimony.** Physician's testimony, based on hypothetical question, assuming that defendant physician wrapped six or seven layers of soft bandage around plaintiff's foot and ankle, instead of only one as plaintiff's evidence tended to show, that treatment was correct and proper, held competent, but not evidence that one layer was substantially sufficient.

**6.—Physicians and Surgeons—Malpractice.** That effect of long continued pressure, producing gangrene on patient's foot, might have been relieved by use of padding, may be established by nonexpert evidence.

**7.—Same—Same.** Physician's negligence in treating gangrenous condition of plaintiff's foot, after discovering it, held for jury.

**8.—Same—Same.** Physician's failure to discover gangrene on patient's foot before removing shoe and insufficient bandage applied after setting broken leg held for jury.

**9.—Evidence—Expert Testimony—Not Binding on Jury.** Expert witnesses' statements are not evidence of facts, but only advisory, and are not binding on a jury, which may disregard such as appears unreasonable to them.

**10—Courts.** When question has been ruled by State Supreme Court, rule of decision in other jurisdictions does not concern Court of Appeals.

**11.—Trial.** Defendant who requested and was given instructions submitting the issues after his general demurrer was refused, waived the right to urge assignment of error based on the demurrer.

**12.—Same.** Assignment of error, based on demurrer, will be ruled on, though defendant requested given instructions submitting issues after demurrer was refused, where new trial must be had on specifications of negligence sufficiently supported to take case to jury.

**13.—Appeal and Error—Appellate Practice.** It is the duty of an appellant to state in the assignment of errors or under points and authorities the specific matter conplained of and to designate where in the record the challenged rulings may be found.

**14.—Trials.** Exclusion of evidence because of commingling of incompetent with competent is not error.

**15.—Evidence—Malpractice Suit.** In malpractice suit, refusal to permit defendant to ask physician testifying for plaintiff whether he stated that defendant gave plaintiff proper treatment held not error, where he was interrogated at length as to what he said about treatment, and witness present at time testified as to such statement.

**16.—Appeal and Error—Appellate Practice—Malpractice Suit.** Refusal to permit defendant in malpractice case to question physician, testifying for plaintiff, as to injury to nerves and blood supply by fracture of femur, cannot be considered, in absence of reference to challenged portion of

record, showing maze of questions and objections, some of which were proper and some not, in examination of such witness.

17.—Evidence—Malpractice Suit. Requiring defendant to include facts developed by plaintiff in hypothetical questions on cross-examination of witness before defendant had put in his evidence held no error.

18.—Appeal and Error—Trial—Testimony Held Not Prejudicial. Admission of physician's testimony in malpractice case that pressure could cause gangrene and that permitting it to go without treatment would quickly cause infection held not prejudicial to defendant, in view of evidence that gangrene is produced by anything sufficiently depleting blood supply, expert evidence not being required to show that long-continued pressure would retard circulation.

19.—Physicians and Surgeons—Malpractice Suit—Specifications of Negligence. Specifications of negligence in malpractice case should be so submitted as to inform jury clearly that defendant need only exercise ordinary skill and care ordinarily possessed and exercised by members of his profession under similar conditions.

20.—Appeal and Error. Error in instruction, which must be recast on retrial because of limitation of grounds for recovery thereon, need not be considered.

21.—Physicians and Surgeons—Malpractice Suit—Instructions. Instruction in malpractice case that negligence may be inferred from facts and circumstances held not error on theory that negligence can only be shown by expert testimony.

22.—Limitation of Actions—Malpractice Suit Held not Barred. Cause of action for malpractice held not barred by two-year statute (section 1319a, Revised Statutes 1919, as added by Laws 1921 p. 197, sec. 1), where plaintiff had been nonsuited in previous suit, and brought cause within section 1329, Revised Statutes 1919.

---

*Corpus Juris-Cyc References: Appeal and Error, 3CJ, p. 1364, n. 78, 80; 4CJ, p. 651, n. 40; p. 997, n. 85; Courts, 15CJ, p. 920, n. 8; p. 922, n. 9; Evidence, 22CJ, p. 713, n. 95; p. 722, n. 91; p. 724, n. 15, 19; p. 729, n. 77; p. 730, n. 78; Limitations of Actions, 37CJ, p. 1087, n. 10; Physicians and Surgeons, 30Cyc, p. 1570, n. 19; p. 1575, n. 54 New; p. 1586, n. 60; p. 1588, n. 82 New, 85; p. 1589, n. 90; Trial, 38Cyc, p. 1335, n. 37; p. 1543, n. 69; p. 1550, n. 48.

Appeal from the Circuit Court of Jasper County.—Hon. S. W. Bates, Judge.

Reversed and remanded.

*Howard Gray* and *Haywood Scott* for appellant.

*W. N. Andrews, W. R. Robertson* and *A. M. Baird* for respondent.

BRADLEY, J.—This cause is for damages for alleged malpractice by defendant, who is a physician and surgeon. A trial to a jury resulted in a verdict and judgment for plaintiff in the sum of $1500 and defendant appealed.

220 Mo. App. 24.

Plaintiff alleged that on April 16, 1922, he employed defendant to set and treat his right leg, the bone of which had been broken between the knee and thigh; that defendant tightly bandaged plaintiff's foot and ankle and placed a shoe thereon, and that said shoe was connected by cords to a heavy weight and so arranged that the weight suspended from the foot and ankle and caused the shoe to press with great force against the foot and ankle and draw the same into a strained, rigid and unnatural position; that defendant in the course of treatment carelessly and negligently increased the pressure upon plaintiff's foot and ankle by the use of excessive weights and carelessly and negligently failed to use sufficient and suitable padding on plaintiff's foot and ankle and carelessly and negligently caused the foot and ankle to be under long, excessive and continued pressure and carelessly and negligently failed to examine plaintiff's foot and ankle to determine the effect of said pressure.

Plaintiff further alleged that as a result of the negligence aforesaid a large portion of his foot and ankle was covered with a gangrenous scab which in time sloughed off to the injury of the tendons, leaders, ligaments, tissues, nerves and muscles of the foot and ankle so that "plaintiff has no use of said foot and ankle except in a small portion of same and said foot and ankle have become paralyzed and useless . . . deformed, crooked, misshapen, unsightly and permanently" injured; that defendant was careless and negligent in failing to examine and treat said foot and ankle when requested by plaintiff.

Plaintiff further alleged that by reason of the negligence of defendant as aforesaid he suffered great pain of body and anguish of mind, paid out large sums for medical supplies, nursing and treatment by other physicians, all to his damage, etc.

The answer is in effect a general denial and a plea of the two year Statute of Limitations. A reply put in issue the new matter pleaded in the answer.

Defendant makes 46 separate assignments, but these may be grouped as follows: (1) Failure to give defendant's peremptory direction at the close of the whole case; (2) on the admission of evidence; (3) on the exclusion of evidence; (4) on the alleged prejudicial attitude of the trial judge; (5) on the instructions given, and (6) on the instructions refused.

Plaintiff, a man 59 years old at the time, had his right leg, between the knee and thigh, broken in an automobile collision. Defendant was called and he and his assistant, Dr. Clinton, first gave emergency treatment at the roadside by putting a board splint on the broken leg. Plaintiff was then taken to a hospital in Carthage, Mo., where a thorough examination was made. Plaintiff refused to remain in the hospital and was removed to his home where he was giv-

en an anesthetic, the broken bone adjusted and what is called a Hodgens splint with traction and weight applied. The traction was made by the application of wide strips of adhesive tape, one on either side of the broken leg and extending from the point of fracture down beyond the foot where they fastened around a wooden block to which was attached a cord and this cord passed over a pulley. At the end of the cord was attached a bucket in which were the weights. The splint was suspended by supports fastened to the head and foot of the bed. The Hodgens splint, which extended beyond the foot, was so constructed that the leg rested in a trough-like place made of muslin fastened to the metal parts of the splint. The pull that was made by the weights kept the ends of the broken bone in apposition.

Four days after the Hodgens splint was applied a sloughing of the skin appeared under the adhesive tape and also under the calf of the leg. When this sloughing appeared the adhesive tape would not hold and the weights were removed. Then for the next ten days defendant sought to get extension so as to hold the broken bone in apposition by raising the foot of the bed and by changing the angle of suspension of the Hodgens splint. This failed to keep the broken bone in apposition, and then defendant tried bandages below the affected area on the leg, but this also was unsuccessful. Then defendant placed around and over the foot and ankle muslin bandage, and over this a silk sock and over the sock an especially prepared shoe with a tongue. The top of the shoe from the bottom of the lace to the toe was cut away. The shoe had an extra sole that extended the full length, and in this extra sole a hole was made immediately in front of the heel. Through this hole a cord was passed, and this cord extended over a pulley and weights to the extent of forty and three-fourths pounds were attached.

After this shoe arrangement had been on two weeks defendant removed the shoe, but not the sock and bandage, and examined the foot so far as it could be examined without removing the covering. He found some adhesions about the ankle, due, he said, to lack of use of the foot, and these he broke by motion. The shoe was again put on and remained for two weeks longer when the whole apparatus including the splint was discarded. And it was found that the arrangement had held the broken bone in apposition and that the break had healed with good results, but dry gangrene was found to be on the instep of the foot and also just above the heel. The above is a statement of the salient facts appertaining to what defendant did and his manner of treatment from the beginning down to the discovery of dry gangrene on the foot when the splint, shoe and bandage were removed. No complaint is made of the result obtained in reducing the fracture.

Plaintiff went to the jury on the following specifications of negligence, which were submitted in the alternative, to-wit: (1) Failure to use sufficient or suitable padding on the foot or ankle; (2) failure to examine or to detect injury to the foot or ankle; (3) failure to reexamine and treat the dry gangrene when requested; (4) negligently maintaining the pressure when evidence of injury was apparent; (5) failure to relieve the foot and ankle of pressure in time to avoid injury; (6) negligently subjecting the foot and ankle to long, undue or continued pressure; and (7) negligently permitting the foot or ankle to become permanently deformed.

There were three areas of dry gangrene developed. One was just above the calf of the leg; one just above the heel; and one on the instep of the foot. Those on the instep and just above the heel caused the serious trouble and we shall confine our consideration to them. Of the injury, pain and suffering, we think it is sufficient to say that the record shows that plaintiff underwent long and severe suffering and pain, and according to the evidence adduced by him and his witnesses his foot is deformed and practically useless. But however severe his pain and suffering, and however deformed and useless his foot may be he cannot recover unless the defendant breached a duty that he owed plaintiff.

A physician or surgeon undertaking the treatment of a patient is not required to possess or exercise the greatest learning or the highest degree of skill. He is only required to possess and exercise that degree of skill and learning ordinarily possessed and exercised by the members of his profession in good standing and it is his duty to use reasonable care and diligence in the exercise of his skill and the application of his learning and to act according to his best judgment. [30 Cyc. 1570; 21 R. C. L., p. 381, sec. 27; Parkell v. Fitzporter, 301 Mo. 217, l. c. 227, 256 S. W. 239, 29 A. L. R. 1305; Krinard v. Westerman, 279 Mo. 680, 216 S. W. 938; Reeves v. Lutz, 179 Mo. App. 61, 162 S. W. 280; Pate v. Dumbauld, 298 Mo. 435, 250 S. W. 49; Spain v. Burch, 169 Mo. App. 94, 154 S. W. 172.] Defendant's learned counsel contend that measured by the rule of defendant's legal duty there is no substantial evidence tending to show that he breached that duty. If such is the case then the demurrer should have been granted.

This record is of unusual length. Our careful reading of the abstract of the record, the additional abstract and the original bill of exceptions sent up by our order has convinced us that there is no substantial evidence to support the 4th, 5th, 6th and 7th specifications as have stated them, and we shall not enter upon a discussion of the evidence in order to demonstrate our conclusion respecting these specifications. On the remaining three specifications, the 1st, 2nd and

3rd, as we have stated them, we think the demurrer turns, hence we shall make disposition of these in the order given.

Was the defendant remiss in his duty to use sufficient or suitable padding on plaintiff's foot and ankle? It is of course a well-known rule of law that measured by the demurrer we accept as true all the evidence tending to support plaintiff's case, unless it should appear to be wholly counter to well-known physical laws or contrary to common experience, while defendant's evidence measured by the demurrer is treated as untrue, except, that which perchance may tend to support plaintiff's case. [Evans v. Clapp, 231 S. W. (Mo. App.) 79; Durbin v. Railroad, 275 S. W. (Mo. App.) 358, l. c. 360.]

The alleged negligence in failing to use suitable and sufficient padding is based on the occasion when defendant improvised the shoe arrangement and reapplied the weight connections. This was about two weeks after plaintiff was injured and about nine or ten days after the adhesive tape arrangement was abandoned. We might state here that according to plaintiff's evidence defendant, when he applied the shoe arrangement, knew that plaintiff had a very tender skin and remarked about it when he removed the adhesive tape. Also according to defendant's evidence on the point, at the time he applied the shoe arrangement and the weights, he knew that there had already developed above the calf of plaintiff's leg a small area of dry gangrene.

Of plaintiff's condition when the shoe arrangement was applied and the effect of pressure defendant on cross-examination testified: "At the time we took the adhesive off the sides of the leg the fifth day, the gangrenous area was on the calf of the leg. It was not very pronounced, but noticeable and I saw it. It suggested to me that he had a vascular condition of the circulation and of the trophic nerves that was bad. The dying of the tissue was due to failure of nourishment of the blood through the control of the trophic nerves. That condition was commencing at that time. That gangrenous area was on the leg of the patient when I put the shoe on. That condition on the leg suggested to me that in that area the parts were not getting proper nutrition. Wherever the soft tissue does not get proper nutrition it is likely to die. Anything which prevents the soft tissue of the leg from securing this nourishment will cause those parts to die or bring about the condition where the tissues die. I knew that at the time I put the shoe on the plaintiff's foot. . . . Wherever you put weight or pressure on the soft tissues of the body it would depend upon the pressure as to whether it would have a tendency to shut off the blood supply. The more pressure we put on the more tendency it would have to shut the blood supply off."

With the knowledge that dry gangrene had already developed, and that plaintiff had a very tender skin, defendant, assording to plain

tiff's evidence, when he applied the shoe arrangement and reapplied the weight connections placed over the foot one round of thin muslin bandage and a silk sock, and over these he placed the shoe. Plaintiff's wife, speaking of the shoe and bandage testified: "Dr. Gentry cut the shoe from the top and put the rope through it. The shoe was put on the foot. Before they put it on, he asked me if I had a silk sock. I went up stairs and brought it. Then he started to put on the tape, one layer of gauze bandage. Seewald (plaintiff) says, 'Doctor, don't you think it would be a good idea to put a little padding on it'? He said, 'Maybe it would; what have you got'? Seewald says to me, 'you go upstairs and get that felt chest protector.' I got it and he looked at it awhile and threw it on the floor and then he went and slipped the shoe on. He put on the bandage first and slipped the sock over and then the shoe. This is the same sock. He laced the shoe up on the foot. He went and put a stick in there and twisted it and then he adjusted it to the splint and wired it so it would stay in place."

Concerning the padding plaintiff testified substantially as did his wife. "I said doctor, 'wouldn't it be better to put on some padding?' He said 'probably; have you got any? I said 'Yes, I got some.' So I told my wife to go upstairs and get one of these chest protectors up there, to bring it down. The chest protector is about a quarter of an inch thick, heavy felt. So doctor took the shoulder part of it, cut it off three or four lengths or inches wide and looked at my shoe like this and throwed it down. He laced the shoe up real tight."

Plaintiff's son who was present when the shoe arrangement was applied corroborated the statements of his father and mother respecting the character of bandage used and the failure to use any padding. The son said: "I was there when the shoe was put on my father's foot. He taken and put a small gauze bandage around the top of his foot, a cloth bandage. He taken a light silk sock and slipped over that. Then he put his shoe on."

Dr. J. W. Clark who followed defendant in treating plaintiff and who was advised of the facts up to the application of the shoe arrangement by a hypothetical question testified that the shoe should have been applied in such a way and the extension and weight so adjusted that damage would not have been done to the soft tissues, which could have been done by reducing the weight and increasing the padding.

We regard defendant's evidence respecting the bandage and manner of applying the shoe as of considerable weight and importance in the consideration of the demurrer on the first specification of negligence. As we have stated if there is anything in the defendant's evidence which tends to support plaintiff's case then plaintiff may invoke such evidence in his defense against the demurrer. Defend-

ant described at some length the steps he had taken and the arrangements he had tried, and after so doing he said: "So I had to get some other means of holding the bones together. So the only other means I could see that was effective was putting the shoe on and that is what I did. I took a shoe of Mr. Seewald's and examined it and thought it would be a good shoe for the purpose. This shoe is the one I used at the time. It had been used some, worn some. Plaintiff's exhibit 'A' is the shoe. I had the heel taken off and this extra sole put on all the way across so the shoe would be even and would not bend the shoe and cramp the foot. It would be something solid and we would get an even straight pull, also get something into which we could fasten the rope to go over here. We found the shoe with a padded soft tongue, and soft shoe that would fit him almost as perfectly as you would expect a shoe to fit, a lined shoe and of soft leather. It was soft and pliable. We put on a bandage of about five or six or seven turns, a roll of bandage around the foot and put over that a silk stocking. The bandage is known as a gauze bandage. It is thin, made out of muslin. It is soft. Over the instep and around the foot I put six or seven thicknesses, over the instep and heel six or seven thicknesses of muslin, perfectly adjusted so it would be smooth. I put over that a silk stocking, a smooth stocking. It fit very nicely, smoothly over the foot. We put the shoe over that and the tongue down and brought the shoe together over the soft tongue and stocking and over the bandage and laced it up so it would fit smooth; a smooth glove fit."

It is not unreasonable to infer from defendant's evidence that he, himself, did not regard a single round of bandage as sufficient. He says that he used six or seven thicknesses and that the shoe and tongue were soft and pliable. Defendant put nine physicians and surgeons on the stand and pronounced to each of them a lengthy hypothetical question wherein the manner of treatment pursued, according to his evidence, was embodied, and in answer the physicians stated in effect that the treatment was correct and proper. But in the question propounded it was assumed that defendant wrapped around the foot and ankle six or seven layers of soft gauze bandage. Defendant had a right, of course, to have the treatment he claimed to have pursued presented and passed upon by experts, and the question in this respect was proper, but the opinion of experts, however many and competent, that six or seven layers of soft bandage were sufficient would be no evidence tending to prove that one layer was substantially sufficient, and plaintiff's evidence tended to show that only one thickness of bandage was used.

There is no controversy about the fact that long-continued pressure would have produced the gangrene which developed on plaintiff's foot, and it does not require expert evidence to establish the

fact that the effect of this pressure might have been to some extent relieved by the use of padding. It seems clear to us that on the issue of sufficient or suitable padding or bandage plaintiff was entitled to go to the jury.

Was there sufficient evidence to make an issue on the failure of defendant to discover the effect of the pressure on plaintiff's foot prior to the time when the shoe and bandage were removed? The shoe arrangement was applied in about two week's after the plaintiff's leg was broken. The leg was broken April 16th, hence we may say that the shoe was put on about the last of April or first of May. According to plaintiff's evidence he began to suffer great pain within an hour after the shoe arrangement with the weights was applied. Defendant had directed that if the pain became too severe to loosen the twist in the rope, and to relieve in that manner the pressure for ten or fifteen minutes at a time, and plaintiff claims to have followed directions implicitly. Plaintiff resided in Carterville and defendant in Carthage. The distance between the two places is eight or nine miles. On the next morning after the shoe arrangement was applied plaintiff sent Gus DeClue to defendant's office to ask him to come to see plaintiff. DeClue informed defendant that plaintiff had had a bad night and "was suffering something awful" with his foot. This was about May 2nd, but defendant did not go to see plaintiff until the next day. Concerning what was said and done on the visit of about May 3rd plaintiff testified: "The next day he came and said, "What seems to be the matter?' I said, 'Doctor I can't stand this. It seems like it would cut my foot off.' He says, 'Well, there is always more or less pain with anything like this,' I says, 'Doctor I can't stand it.' He says, 'You must not expect to have no pain at all; you got a break up here. You must have pain somewhere.'"

Defendant said that the pain in the foot was due to poor circulation and directed that plaintiff work his toes up "a little bit." Plaintiff obeyed and defendant assisted. After this visit according to plaintiff's evidence defendant did not again visit plaintiff for about two weeks. During this time plaintiff had suffered severely, but had observed directions. "We didn't know what to do, so I kept on this way and finally the Doctor came back again in about two weeks probably. In two weeks he come out again, so when he come in I told him the trouble in my foot, it hurt so bad. He said, 'Well work them toes a little bit.' I said, 'Doctor, them toes seem to be dead numb.' He said, 'Oh, they aren't dead.' He took the shoe off and took a hold like this and worked it. He commenced working my foot like this and this. By doing this it hurt so awful bad in here. I complained. 'Well,' he said, 'Didn't you say they didn't have no feeling in there?' I said, 'Sure, but that is my heel.' Seemed like he was tearing that heel off. The shoe had been on the second

week, so he put the shoe back on and said, 'Just keep working those toes. The circulation is mighty poor, keep working them.' ''.

On the occasion last referred to when defendant visited plaintiff about May 16th or 17th he removed the shoe, but did not remove the sock and bandage from the foot. It is contended by plaintiff that ordinary prudence would have suggested that something out of the ordinary was affecting his foot, and that since defendant was advised of the great pain in the foot and knew of plaintiff's tender skin, and that gangrene had already developed above the calf of the leg, that he should have removed the sock and bandage, so that a better examination of the foot could have been made. Of this occasion defendant testified: ''When I took the shoe off the first time, I examined the foot carefully by feeling the toes and testing the warmth of them. I found his ankle was a little stiff. I moved his ankle so as to break up the adhesion forming in the ankle which form on account of the nonuse of the ankle. He said it hurt him, which it did. It would anyone. I worked it and considered the circulation was quite good enough. By feeling the foot over I could find no condition which warranted my leaving the shoe off. I put the shoe back on and reapplied the weights.''

After the visit about May 16th or 17th defendant did not see plaintiff again until the lapse of about two weeks at which time he removed the shoe, sock and bandage and for the first time discovered the gangrenous areas on the instep and the heel. Plaintiff's son George a grown man, had his arm broken in the collision when plaintiff was injured, and defendant set the arm and treated the son, and the son went to defendant's office for treatment. It does not definitely appear just how many times the son went to defendant's office and when, but it does appear that he went frequently during the entire time that the shoe arrangement was on and attached to plaintiff's foot. When the son visited defendant's office he advised defendant of plaintiff's suffering due to pain in the foot. Of this the son testified: ''After the shoe was put on I went to Dr. Gentry's office. He asked me how my father was getting along. I told him he suffered quite a little and was complaining about the shoe hurting his foot. Dr. Gentry said, 'The only thing to do is just to loosen the twist a little bit and let him rest and put it back on again.' Practically during all the time the shoe was on I told Dr. Gentry whenever he would ask me the condition of my father's foot. I can't say exactly how often I would call his attention to that. Three or four times, I think, he said he would come down to see him that day or in a few days. He came down two or three times I think. The shoe remained on my father's foot about four weeks.''

Plaintiff's wife respecting the visit of about May 16th or 17th and the attention given thereafter up until the shoe and bandage

were removed testified: "He put the weights back on with the same irons as before. At the time he worked that foot he left bandage and sock on. The doctor left orders with us to make him exercise his toes and massage his leg and also his instep. I do not remember seeing any sores on his foot. He continued to suffer with that foot, so we sent word to the doctor. Sometimes doctor came in response to those messages and sometimes he did not. After the twelfth day he came again in two weeks; twice in four weeks."

The history of plaintiff's condition, the requests made of defendant for attention and the attention given during the four weeks the shoe arrangement was attached, were detailed in hypothetical questions to Dr. J. W. Clark and the answers given were to the effect that defendant did not during this period, give proper attention to plaintiff. Defendant testified that he was charging plaintiff a lump sum and therefore did not make a book entry of every visit, but that he did make a book entry of many of the visits; that during the month of May he visited plaintiff on the 3rd, 6th, 9th, 13th, 21st, 23rd, and 26th. Thus it appears that defendant claims to have made about three times as many visits during the period that the shoe remained on the foot as were credited to him by plaintiff. Defendant also offered expert evidence tending to show that his attention and treatment during the period the shoe was retained was reasonable. But defendant in his hypothetical questions presented the facts from his viewpoint which he had a right to do, but if the facts were as claimed by plaintiff, and measured by the demurrer we assume such to be the fact, then defendant's expert evidence, however much, would not conclusively disprove plaintiff's contention that the treatment and attention were not what is reasonably required. Such expert evidence tended to corroborate defendant, but, being predicated on different facts, it did no more. To illustrate: When Dr. Neff, a witness for defendant, was on the stand the history of plaintiff's injury, his condition and the treatment given were detailed in hypothetical question down to the time when the shoe was applied, and then the question continues in this wise: "After the apparatus had been on two weeks the shoe was removed and an examination made of the foot by the attending physician and the toes and foot were found to be warm *and there was no evidence of gangrene or necrosis* (Italics ours); the shoe was put back on and remained on for another two weeks; at the end of four weeks from the time the shoe was first put on it was removed and the sock and bandage removed from the foot and the leg taken out of the splint; the bone had united and a necrotic or gangrenous area was found over the front part of the foot and above the region of the heel just back of the ankle," etc.

While defendant in his hypothetical question assumes that at the end of two weeks after the shoe was applied there was no evidence of

gangrene, yet he knew that plaintiff's skin was very tender and that for two weeks there had existed a condition which would tend to retard the circulation and bring about the gangrenous condition that was found when the shoe and bandage were removed. And notwithstanding this knowledge, and also the knowledge that for the two weeks the shoe had been on the foot plaintiff had suffered intensely with his foot, defendant, when he removed the shoe at the end of two weeks, did not remove the sock and bandage so that he could *know* the condition of the foot instead of *assuming* the condition from an examination made without removing the bandage.

According to plaintiff's evidence he received but little attention from defendant from the time the shoe arrangement was applied, and we cannot say from this record as a matter of law that defendant gave to plaintiff that degree of care and attention that the law requires. Therefore the second specification of negligence was a question of fact for the jury.

Was defendant negligent in his attention and treatment of the gangrenous condition on plaintiff's foot after it was discovered? When the shoe and bandage were removed and the ugly areas of gangrene on the instep and heel exposed defendant did nothing, according to plaintiff's evidence, towards treating these affected places, but advised that they be let alone. Defendant testified that he did nothing "to these areas in the way of treatment except just dressing them and keeping them dry by not putting moisture on them and putting on nothing except boracic acid powder. Boracic acid powder is a mild anticeptic and it is dry." According to the evidence of the physicians and surgeons the dead tissues caused by dry gangrene should not be removed until what is called the line of demarcation appears. Dr. Chenoweth, a witness for defendant, described dry gangrene and its treatment as follows: "We dry up the gangrene and try and all that, but speaking about the line of demarcation we mean the dead becomes separated from the living and nature builds up what we call granulated tissue under the dead tissue so when it does come off the danger of infection is practically eliminated . . . I want to be plain about this thing as I can. When the line of demarcation is formed all the tissues are dead that will die. Nature has repaired that injury by building up underneath it what we call granulated tissue, that is, tissue that doesn't absorb. After the line of demarcation is formed that dead tissue should be removed. The skin separates just exactly like a scab when a scab gets dry on the back of your hand. By and by you will notice it is beginning to curl up on the edge. If you pull it off too soon some of it might bleed in the center of it, and if you open new tissue, there will be more tissue die, there will be more infection, more dead tissue, so the tissue should

not be removed until the line of demarcation had completely formed. If you do not invite disaster.''

To the nine expert witnesses for defendant counsel hypothecated the facts appertaining to the manner in which defendant treated the dry gangrene on the instep and heel as follows: ''These necrotic areas were dry and no line of demarcation had yet appeared *to* the attending physician treated them and had the attendants of the plaintiff also treat them at intervals from three or four to five days by the application of boracic acid powder until the attending physician last attended the plaintiff.''

The facts were hypothecated according to defendant's version, and all of the witnesses stated that such treatment was proper. But as stated, according to plaintiff and his witnesses, defendant did nothing towards treating the gangrenous areas on the instep and heel. On this question plaintiff testified: ''Q. I will get you to state whether or not after the gangrenous areas appeared on your instep and heel, whether or not Dr. Gentry ever placed any boracic acid or other powder or dressing or any of them on your instep or heel? A. No, sir. Q. Did he ever instruct you or anyone in your hearing to put any powder or dressing or either of them on your instep or heel? A. No, sir.'' Plaintiff's wife and son and the witness DeClue who assisted in nursing and waiting on plaintiff testified to the same effect.

Just when the shoe and bandage were removed and the gangrene on the instep and heel discovered cannot be definitely determined from this record. Defendant places the time on May 26th. Plaintiff's counsel say that it was May 28th. Whatever date that took place defendant did not see plaintiff again until June 9th although he was sent for quite frequently and advised that plaintiff was suffering much from pain in the foot. At the time of his visit on June 9th he testified that the line of demarcation had not appeared and that therefore there was nothing to do except to continue the treatment he claims to have been following. Following June 9th plaintiff continued to suffer from his foot and sent for defendant, but defendant considered that the line of demarcation would not be developed prior to about June 20th and did not go.

Plaintiff at intervals between June 9th and June 16th sent for defendant who did not respond, and on June 16th a week after defendant's last visit plaintiff sent for Dr. Clark. Plaintiff described his condition at the time he changed doctors as follows: ''This crust was on it like this right in here pinching down on my instep. It was awful pain. It was black, real dark brown here on the instep and here. This part I didn't get to see I couldn't. I told my wife to get a doctor. 'Get Dr. Clark; something has got to be done.' That was about seven or eight weeks after I got hurt, so Dr. Clark came up. He looked at it. He pulled off those crusts; all like that on my in-

step and heel. He put my foot in warm water and bathed it good and put some antiseptic on it and put medicated cotton and all on top and put a bandage on it with lots of cotton above. The effect it had on me was I near went to sleep while he had my foot in warm water. My suffering grew better, easier. I had very little pain. It was probably a month before I healed up.''

Dr. Clark testified that when he was called June 16th ''the. line of demarcation was already distinct.'' He described what he did thus: ''I simply had about three gallons of water boiled and sterilized and allowed that to run over each of these places until everything was so softened it either come off through the water or was hanging loose and could be easily picked off.''

Dr. Clark also testified to the effect as we understand from the hypothetical questions propounded to him and his answers that it is dangerous, even before the line of demarcation appears, to fail to cleanse and dress the dry gangrene area. In propounding a hypothetical question based on the facts as developed by plaintiff's case, plaintiff's counsel stated that the attending physician, the defendant, was informed that ''the patient was in awful pain; that the sores on the instep and heel were getting bigger all the time; that it stunk so badly they could hardly stay in the house; that there was watery liquid running out of them; that he had better come down and do something, for the patient's foot was rotting off.'' The witness was then asked what would be ''the proper method of treatment for the patient by a physician and surgeon possessing and exercising that degree of skill and learning ordinarily possessed and exercised by the members of your profession in good standing, practicing under like condition at that time in Carterville or similar localities?''

To this question Dr. Clark answered: ''The physician should immediately dress these wounds and protect them from infection.''

Defendant introduced evidence tending to show that the line of demarcation had not appeared when Dr. Clark first treated plaintiff's foot and that the alleged premature treatment given by Dr. Clark would more likely be harmful than helpful, and that plaintiff's deformed and practically useless foot is attributable to this premature treatment. Of this, of course, we cannot say. We must take the record as it is and rule on the demurrer as the law prescribes. And with the rules governing demurrers in mind we must rule that plaintiff was entitled to go to the jury on the third specification of negligence as we have stated them. Hence we rule that defendant's demurrer to the evidence was properly refused.

We might here dispose of a question raised by defendant which properly belongs under the assignment on the. demurrer and where counsel place and brief it. Learned counsel contend that before recovery can be had in a malpractice case it must be shown by ex-

pert evidence only that the injury complained of was the proximate result of the alleged negligence. Counsel in their brief say: "And where there was no testimony by any witness qualified to speak (medical experts) that the injury complained of by plaintiff is the proximate result of defendant's acts or omissions then the plaintiff cannot recover." Again counsel say in their brief: "No one but a physician or surgeon can say that an alleged physical injury or disease was the proximate result of alleged negligent acts or omissions of a physician and surgeon."

As supporting this contention counsel cite Pate v. Dumbauld, 298 Mo. 435, 250 S. W. 49; Spain v. Burch, 169 Mo. App. 94, 154 S. W. 172; and Connelly v. Cone, 205 Mo. App. 395, 224 S. W. 1011. In addition to these a great array of cases are cited from other jurisdictions. We do not regard the point specifically ruled in either of the cases cited from our own jurisdiction, hence it is not necessary to enter upon an extended discussion of what is and what is not ruled in the cases cited from this State. In Pate v. Dumbauld, the question now in hand was raised, but as we read it was not decided. The only thing there said on the question is this: "Counsel for appellant have cited an array of authorities in support of the proposition that respondent's case, if not supported by expert testimony, must fail. We do not deem it necessary to enter into an extended discussion of this subject. No man should be held to a higher degree of skill or care than a fair average of his trade or profession, and the standard of due care is the conduct of the average prudent man. Taking the testimony of plaintiff and his witnesses at full value, we are of the opinion that respondent has failed to show by substantial evidence that appellant was derelict in respect to his professional duty in this case, or that he was guilty of any of the specific acts of negligence charged against him in the petition."

Hoyberg v. Henske, 153 Mo. 63, 55 S. W. 83, was a malpractice case. In that case the physician was employed to treat an area which had been broken above the elbow. The arm became affected with gangrene. The negligence alleged was the unskillful and negligent manner in which the fracture was reduced, the arm bandaged and the injury treated. In the Hoyberg case this language is used:

"Counsel for defendant charges that the trial court erred in giving instruction number 3 on behalf of the plaintiff, and he relies for reversal, in the main, upon his objection to this instruction. The instruction of which he complains, in effect, told the jury that in determining the question as to whether or not the defendant exercised such skill and care of plaintiff's broken arm as under the law he should have exercised, they were not bound by the opinions of expert witnesses, but had the right to disregard all or any part of such opinions as appeared to the jury to be unreasonable. We fail

to recognize the vice in this instruction counsel seeks to point out. It is the established law as declared by this court that where experts are called to testify, their statements are not to be considered as evidence of facts, but are of an advisory nature, and they are permitted to express opinions because of the peculiar knowledge they possess, but juries are in no wise bound to blindly accept their ideas, but after receiving the advice of experts are permitted to use their own judgment in passing upon the things concerning which the opinions are given, and they are necessarily permitted to disregard the testimony of such experts as may appear to them unreasonable. [Cosgrove v. Leonard, 134 Mo. 419; St. Louis O. H. & C. Ry. v. Fowler. 142 Mo. 670; City of Kansas v. Hill, 80 Mo. 523; City of Kansas v. Butterfield, 89 Mo. 646.] Almost the same instruction as the one here complained of was approved in the case of St. Louis v. Ranken, 95 Mo. 189. Were it not so, because of widely diversified notions and wholly different results arrived at by separate individuals even when forming conclusions upon the same facts and circumstances, juries would be wholly at sea, and to refuse to permit them to be their own judges of what is reasonable and what is unreasonable would operate as a failure of the purposes for which they are called in this class of cases."

Ulrich v. Railroad, 281 Mo. 687, 220 S. W. 682, was a personal injury case, but, as we construe, what is there said appertaining to the question now under consideration is directly to the point. There this language is used:

"The instruction concerning expert testimony was in substantially the same form as that approved by Court en Banc, in the face of the same objection made here, in Hoyberg v. Henske, 153 Mo. l. c. 75, 76. This decision was followed in Markey v. Railroad, 185 Mo. l. c. 364; Burns v. Ice & Fuel Co., 187 S. W. 148, 149, and Gold v. Jewelry Co., 165 Mo. App. l. c. 166. In addition, the expert testimony had reference to the character, extent and permanence of appellant's injury, and spent its force on the issue as to the measure of damages. The jury found appellant was not injured by respondent at all. In view of this the instruction becomes unimportant."

The Hoyberg case has been cited with approval a great number of times. Both that case and the Ulrich case were en Banc, and the Ulrich case is recent. While the Ulrich case does not rule so specifically on the question as does the Hoyberg case, yet from the language used it cannot be contended that the rule announced in the Hoyberg case as to expert evidence is abandoned. Counsel in effect concede that the rule announced in the Hoyberg case is counter to their contention, but say it is out of line and contrary to subsequent rulings. Counsel do not cite us to any subsequent ruling of our Supreme Court, and we find none, which holds contrary to the

doctrine announced in the Hoyberg case. So far as we have been able to ascertain the case has not even been criticised. What the rule of decision may be in other jurisdictions does not concern us when a question under consideration is already ruled by our Supreme Court. We might here say that the evidence of Dr. Clark tended to support the three specifications of negligence we have considered, supra. Defendant in effect contends that there is nothing in the record to show that Dr. Clark was qualified to speak as an expert. No such objection was made *nisi* and had there been there was nothing upon which to base it.

Plaintiff makes the point that defendant requested and was given instructions submitting the issues after his general demurrer was refused and contends that such being the case defendant waived the right to urge the assignment based upon the demurrer. In Mills v. Steadley & Company, 279 S. W. 160, we had occasion to consider a like question. There we ruled: "Where there is more than one count, each based upon different or separate grounds, or where there are several grounds in one count, any one of which might be sufficient to support an action or defense, as the case may be, and a general demurrer to the evidence is refused, and thereafter the party offering the demurrer requests instructions which are given submitting the issues, he thereby waives the right to insist that there was no evidence justifying the submission of the issues." In support of this ruling we cited Ramsey v. Mississippi River & B. T. Ry., — Mo. App. —, 253 S. W. 1079; Union Station Bank v. Wangler, Mo. App. —, 254 S. W. 739; Leahy v. Winkel, — Mo. App. —, 251 S. W. 483; Kincaid v. Estes, — Mo. App. —, 262 S. W. 399; Torrance v. Pryor, — Mo. App. —, 210 S. W. 430; State ex rel. Mississippi River & B. T. Ry. v. Allen, — Mo. Sup. —, 272 S. W. 925.

Clearly defendant's requesting instructions which were given submitting the issues after his general demurrer was refused did waive the right to thereafter invoke the assignment based upon the demurrer. But in view of another trial on the specifications of negligence we have deemed sufficiently supported to take the case to the jury it was necessary to rule on the assignment based on the demurrer.

On the exclusion of evidence defendant contends under his points and authorities, the substance of which is covered by the assignments proper, that error was committed; (1) In refusing to permit defendant to ask Dr. Clark, plaintiff's witness, whether he had stated that defendant had given plaintiff the proper treatment; (2) in refusing to permit defendant to interrogate Dr. Clark as to whether or not there is a corresponding injury to the trophic nerves and blood supply in cases of fracture of the femur; (3) in refusing to permit defendant to interrogate Dr. Clark as to whether or not defendant had given plaintiff the proper treatment; (4) in refusing to permit

defendant to interrogate Dr. Clark as to whether or not the appearance of the dry gangrene at the time he first saw it was the same as described by defendant when he last saw it; (5) in refusing to permit defendant to show that if the blood circulation was impeded or interfered with by anything for which defendant was not responsible that ill results and bad conditions would follow independently of and regardless of any negligence in treatment; (6) in limiting the cross-examination of Dr. Clark respecting the condition at the time of his first examination of plaintiff; and (7) in not permitting defendant's hypothetical question to be answered unless it included the facts developed by plaintiff as well as those developed by defendant.

In addition to the above assignments on the exclusion of evidence defendant makes 19 other assignments based on the same theory. Also several assignments are made on the admission of alleged incompetent and prejudicial evidence.

This record is long and complicated, but notwithstanding this counsel have made no effort to point out or designate the record page where support for the alleged errors may be found. It is not our province to sift the record to find support for these assignments. It is the duty of an appellant to state in the assignment of errors or under points and authorities the specific matters complained of and to designate where in the record the challenged rulings may be found. [Nevins v. Gilliland, 290 Mo. 293, 234 S. W. 818.]

A separate disposition of the assignments based on the admission and exclusion of evidence would extend this opinion beyond reasonable length. It may already be beyond that point, but since there is to be another trial we shall give brief space to these assignments. Defendant was given almost unlimited range in cross-examination of Dr. Clark and has but little, if any, complaint in that respect. Oftentimes it occurs that evidence is excluded on objection because of the commingling of the incompetent with the competent, as indicated by the question or the offering, and such is the situation here in some instances. For such the trial court cannot be convicted of error. Defendant complains, as above stated, that he was not permitted to ask Dr. Clark whether he had stated that defendant had given plaintiff the proper treatment. We reason by a process of elimination that defendant has reference to an occasion when counsel interviewed Dr. Clark. If we are correct in our conclusion then the complaint is without merit because the record shows that Dr. Clark was interrogated somewhat at length as to what he said on that occasion about the treatment given by defendant. And in addition defendant put on the stand a witness who was present on that occasion and this witness testified to the effect that Dr. Clark on that occasion stated that "he discovered nothing to indicate that the treatment had been improper."

220 Mo. App.—25.

As to the complaint that defendant was not permitted to interrogate Dr. Clark as to whether or not there is a corresponding injury to the trophic nerves and blood supply in cases of fracture of the femur we think it sufficient to say that we do not find in the record anything substantial to support this assignment. The entire examination of Dr. Clark is a maze of questions, objections and hypothetical questions and objections, some proper and some not, and unaided by record reference we are unable to determine in every instance just what portion of the record is challenged.

As to the assignment that defendant was required to include in his hypothetical questions the facts developed by plaintiff as well as by the defendant we have stated above that defendant might properly hypothecate the facts from his theory. And this he was permitted to do except in the instance near the close of Dr. Clark's cross-examination. But at that time defendant had not put in his evidence and many of the facts assumed in the question were not then in evidence. Hence there is no substantial merit to this assignment.

We do not deem it necessary to further continue the consideration of the assignments based on the exclusion of evidence. At another trial great care no doubt will be observed, as was observed, to give to defendant full freedom and opportunity, within the limits of the law, to develop his case on his own theory.

Defendant complains on the ground that Dr. Clark was permitted to testify that the bandages used might produce gangrene. It appears that Dr. Clark testified that "pressure would or could cause" the gangrene that he found on plaintiff's foot, and that "permitting this gangrenous area to go without treatment would quickly cause infection." All of the evidence on the point, both for plaintiff and defendant, was to the effect that gangrene is produced by anything that sufficiently depletes the blood supply, and it does not require expert evidence to establish that long continued pressure would retard the circulation. We do not think that defendant was in anywise prejudiced by the evidence of Dr. Clark in the respect mentioned.

It is not necessary to consider the other assignments based on the admission of evidence. There is no substantial grounds for complaint in this respect.

Defendant complains of the alleged prejudicial attitude of the trial judge. This assignment is without substantial merit. There may have been occasions during the rather long and tedious trial when the learned trial Judge may have slightly deviated from that even tempered serenity that usually obtains, but we do not find in the record anything of substance that tends to show that the trial judge was in the least prejudiced.

There were 5 instructions given for plaintiff and 9 for defendant, and 19 instructions requested by defendant were refused. Defend-

ant challenges instructions 1, 2, 3, and 7 given for plaintiff and
complains because instructions E, G, I, L, Q, S, T, U, V and W re
quested by defendant were refused.

As already stated in our disposition of the demurrer we are of the
opinion that plaintiff submitted in his instruction No. 1 grounds of
recovery for which there is no substantial evidential support. This
instruction is also phrased in a manner that would likely mislead
and confuse. The three specifications of negligence upon which, as
we have ruled, there is sufficient evidence to go to the jury, should be
so submitted that the jury will be clearly informed that defendant
was only required to exercise the ordinary skill and care ordinarily
possessed and exercised by members of his profession under similar
conditions. Since the grounds upon which plaintiff will rely for re-
covery at a second trial will be limited to the three mentioned, supra,
his instruction No. 2 will necessarily have to be recast, hence com-
plaint against this instruction, if it is again requested, may be ob-
viated.

Instruction No. 3 given for plaintiff is as follows: ''The court in-
structs the jury that proof of negligence need not be by direct tes-
timony, but may be inferred by the jury from all the facts and cir-
cumstances in evidence in the case.''

Defendant vigorously contends that this instruction is ''the height
of error in a malpractice case.'' The argument presented against
this instruction is founded on the theory that in a malpractice case
against a physician, negligence can only be shown by the evidence of
expert witnesses. And under this assignment defendant cites the
same authorities cited to support the same questions we disposed of
supra in ruling on the demurrer. This identical instruction was given
in Wheeler v. Bowles, 163 Mo. 398, 63 S. W. 375, which was a mal-
practice case, and there the court said: ''Indeed, we may remark
that we have rarely found a fairer set of instructions in a negligence
case. Surely defendant has no right to complain of them.'' It is true
that the instruction was not specifically approved, but on the other
hand if it was of such prejudicial moment, as defendant here con-
tends, it is not reasonable that it would with the others be given
complimentary mention. Such an instruction is common in negli-
gence cases generally, and to rule that this frequently used instruc-
tion has no place in a malpractice case would be a long step towards
the adoption of the contention made by defendant that negligence
of a physician can only be established by the evidence of experts.
What we have said respecting the assignment based on plaintiff's in-
structions is we think sufficient, without further consideration here.
It is not necessary to consider in detail the assignment based on de-
fendant's refused instructions. The 9 given at defendant's request

we think were sufficient. And we might say that defendant's instruction Y is more than the law will support. The presumption there mentioned only obtains in the absence of evidence to the contrary. [Pate v. Dumbauld, 298 Mo. 435, 250 S. W. 49.]

In addition to the assignments mentioned defendant contends that plaintiff's cause is barred by the two year statute of limitations. [Sec. 1319a, Laws 1921, pp. 197, 198.] Plaintiff had previously brought suit against defendant for the injuries complained of and had been nonsuited. He introduced in the present cause evidence to bring his cause, so far as concerns the question of limitation, under section 1329, Revised Statutes 1919.

The judgment should be reversed and the cause remanded and it is so ordered. *Cox, P. J.,* and *Bailey, J.,* concur. •