JULIA WILT, Respondent, v. DR. F. M. McCALLUM,
et al., Appellants.

.In the Kansas City Court Of Appeals, May 21, 1923.

1. PHYSICIANS AND SURGEONS: Degree of Care: Duty of
Physician and Anaesthetist in Administering Anaesthetic to Patient
is That of Ordinary Care. The duty owing by a physician and an
anaesthetist, in administering an anaesthetic to a patient, is that
of ordinary care.

2. ————: Explosion: Complicated Machinery: Res Ipsa Loquitur:
Where Plaintiff was Injured by Explosion of Anaesthetic Machine,
Doctrine of Res Ipsa Loquitur Held not Applicable. In an action
for injuries received as result of an explosion of an anaesthetic
machine being used in connection with the anaesthetizing of
plaintiff, where the cause of the explosion of said complicated ma-
chine was left to speculation and conjecture, there being no evi-
dence showing that the explosion was one, that according to ordi-
nary experience does not happen if the apparatus were being ope-
rated with proper care, the rule of *res ipsa loquitur* cannot be ap-
plied.

3. ————: ————: ————: Surgeons Were Not Required to See That
Gases Contained in Receptacles Furnished by Reputable Manufac-
turer, Contained no Foreign Substance. If the explosion of an
anaesthetic machine used by surgeon in administering anaesthetic
to plaintiff, preparatory to an operation, was caused by improper
ingredients mixed with proper ones contained in receptacles ·fur-
nished by a reputable manufacturer, the surgeons would not be
liable for the injury to plaintiff as a result thereof.

4. ————: Degree of Care: The Fact That a Contract Relation Existed
Between Surgeons and Patient, Did not Require Them to Use More
Than Ordinary Care. The fact that a contractual relation existed

214 Mo. App.—21.

between surgeons and their patient, injured as result of explosion of an anaesthetic machine used in connection with the anaesthetizing of plaintiff, did not require surgeons to use more than ordinary care.

### ON REHEARING.

5. ——: ——: Absent Evidence to Contrary, Law Presumes Surgeons in Anaesthetizing Patient Did Their Duty Properly. In an action against surgeon and anaesthetist, using an anaesthetic machine in anaesthetizing patient which exploded, injuring her, it is *held* that in the absence of evidence to the contrary, the law presumes that they did their duty properly.

Appeal from the Circuit Court of Jackson County.—
Hon. *James H. Austin*, Judge.

REVERSED AND REMANDED.

*Watson, Gage & Ess* for respondent.

*Haff, Meservey, German & Michaels* for appellant.

(*Certiorari* denied by Supreme Court)

BLAND, J.—The following opinion of BLAND, J., as originally written, is hereby adopted as the opinion of this court on rehearing, except as hereinafter stated. The original opinion inadvertently referred to the machine in question as a "Wampler" machine, when the correct name was "Wappler." This error, however, is not material and in no way affects the conclusions reached. The opinion reads as follows:

This is a suit for damages for personal injuries. Plaintiff recovered a verdict and judgment in the sum of $6000 but voluntarily remitted the sum of $3000 from the judgment, resulting in a final judgment in her favor in the sum of $3000 and defendants have appealed. The suit grew out of an explosion of an anaesthetic machine being used in connection with the anaesthetizing of plaintiff. The explosion occurred while she was unconscious. The case was pleaded and submitted on the *res ipsa loqui-*

*tur* theory. Defendants contend that their separate and joint demurrers to the evidence should have been sustained; that such theory has no place under the facts in this case.

The facts show that on April 14, 1920, plaintiff a woman forty-seven years of age, consulted the defendant, Dr. McCallum, concerning a bladder complaint. The doctor examined her and discovered a growth known as a caruncle in the urethra. He advised an operation to which plaintiff consented. The doctor told her that the operation would be of a minor character and that she would not be in the hospital more than three or four days. She left to him the matter of making the arrangement for an anaesthetist and he selected the defendant, Dr. Hallberg, to act in that capacity. Plaintiff repaired to a hospital in Kansas City where she was taken to the operating room and an anaesthetic consisting of nitrous oxide, commonly known as laughing gas, mixed with oxygen was administered to her by Dr. Hallberg. A Heidbrink gas apparatus, belonging to Hallberg, was used.

Plaintiff testified that before Dr. Hallberg put the gas mask over her face some one said, " 'This should be warm' and another replied, 'It is cold,' and the first said, 'It is getting warm.' " Shortly thereafter the face or gas mask was applied and plaintiff began breathing deeply and finally became unconscious. The next thing she knew was when she awoke with a "terribly distressed feeling." Persons around her seemed excited, "talking about burns and eyes." She was struggling for her breath and was nauseated and as soon as she got her breath, she asked what had happened. Someone said there had been an explosion. The explosion caused her face to be burned and an injury to her eyes.

Some time after the accident Dr. McCallum was explaining to a friend of plaintiff what had occurred, saying, "We had a terrible accident out there, Faulkner; awful." "The machine is blown all to hell." "He said the machine had blown up and had burned and struck

Mrs. Wilt in the face, and he drew his fist back and says, 'if I were to hit you with all the force I could, Faulkner, it would not be anything compared with the force of that machine hitting her.' " Faulkner asked the cause of the explosion and Dr. McCallum answered, "I don't know, when we started the machine, it seemed to be cold, and I laid my hand on it and says to the doctor that was giving the anaesthetic, it should be warm."

As before stated, the anaesthetic machine being used by Dr. Hallberg was known as a Heidbrink apparatus. This had two rubber tubes attached, each extending to a steel gas tank, one containing nitrous oxide and the other oxygen. The nitrous oxide passed through a chamber on the machine having attached underneath an electrical resistance coil connected by a cord to the general electric service of the city. The purpose of this electrical equipment was to heat the nitrous oxide. The purpose of heating this gas was to have it at such a temperature that it would not frost up in the tubes, which it would do if cold, to have an even flow and constant supply of the vapor and also to warm the vapor so it would not irritate the patient's throat and lungs. After the nitrous oxide is heated it flows out of the chamber and there comes in contact with the oxygen with which it is mixed in the proper proportions; the mixture then flows through a rubber tube one inch in diameter and three or four feet in length. This tube was reinforced by a small wire imbedded in the rubber to keep the tube from collapsing. The end of the tube was fastened to the nose piece of the face mask. This nose piece was composed of rubber and is a non-conductor of electricity. The face mask was composed of celluloid with a rubber cushion which fitted over the patient's face. The nose piece of the mask came within an eighth of an inch of the patient's nose. Celluloid and rubber are non-conductors of electricity. Nitrous oxide and oxygen gas or vapor are non-explosive and will not explode even when brought in contact with a flame.

Wilt v. McCallum.

Dr. McCallum was using a Wampler high frequency electrical converter in connection with the operation. He had removed the caruncle and was using this machine to cauterize the wound. As soon as the electrode of this machine was applied to plaintiff there was an explosion in the gas mask and rubber tubes attached thereto, a hole being blown in the tube four or five inches from the face mask. Dr. Hallberg testified that the face mask was blown out of his hand but was not damaged, nor was any of the rest of the machine damaged in any particular except as to the hole blown in the tube. However, Dr. Mc-Callum stated to Faulkner that "the machine is blown all to hell." Whether this raises a conflict in the testimony as to the extent of the damage to the machine we need not say for the reason that we do not think the extent of the conflict to be material. It is not now disputed that the entire machine was not wrecked.

The evidence shows that the explosion occurred about ten minutes after the gas began to flow into the gas mask and about three to five minutes after plaintiff became unconscious, requiring around six minutes after the gas started to flow into the gas mask for plaintiff to become unconscious. It requires three or four minutes to heat the nitrous oxide after the current is turned on. Plaintiff remained unconscious two or three minutes after the explosion, during which time Dr. McCallum finished cauterizing.

The evidence shows that the kind of current manufactured by the Wampler transformer is the same as used in wireless, having an extremely high voltage of one hundred thousand volts, the amperage being low. This current has a very peculiar effect upon the human body, not quite understood by electrical experts; it may flow over or through a person without injury or with very little sensation but sufficiently to light a lamp or cause enough heat to render a small wire red hot; when applied to the body in sufficient quantity it will cause sparks to radiate therefrom. The evidence shows that the Wampler transformer is a well-recognized machine of standard

make and commonly used by reputable surgeons in operations of this kind, and that there was nothing, so far as experience in the working of the machine was concerned, to indicate that it was not in good order. This Wampler apparatus had been used many times since without repair or any change being made in it. Unless the mere fact that the explosion occurred shows that it was not in good order, the evidence is uncontradicted that it was. The same may be said of the Heidbrink apparatus being used by Dr. Hallberg. The electricity being used in connection with the Wampler apparatus was obtained through the ordinary city service. There was no wire or metallic connection between the Wampler and the Heidbrink machines.

The purpose of transforming the electricity into a high frequency current was to get a current of many interruptions. These interruptions would run into millions in a second and would cause innumerable hot sparks, making an ideal cauterizing agency. Of course, plaintiff was unconscious and did not know what happened to her. She did not call to the witness stand any person who was present at the time of the explosion, although there was at least one other there, aside from the two doctors, assisting in the operation. The evidence as to what happened was brought out on the part of the defendants. Dr. Hallberg testified that plaintiff was brought into the operating room; that Dr. McCallum announced that he was ready to operate and the witness prepared to put plaintiff asleep. Someone, he did not know who, touched the Heidbrink apparatus between the two gas tanks and asked if "the thing was warm." Witness then touched it himself and said, "not yet," and he waited a few minutes and it warmed up and then he put the gas mask over plaintiff's face and started to give her the gas. When she was asleep he told Dr. McCallum that she was ready and Dr. McCallum began the operation. After five or six minutes there was an explosion. Dr. McCallum testified that when plaintiff was under the effects of the anaesthetic he cut off the caruncle and started to

apply the cauterizer but as soon as the electrode was applied to plaintiff's body an explosion occurred.

Plaintiff, in chief, placed upon the stand Dr. Cross, a chemist who, together with his assistants, made the tests for the Kansas City Oxygen Company which manufactured the gas being used at the time of the explosion. He testified that a combination of nitrous oxide and oxygen is not explosive unless mixed with material containing carbon or other foreign substances. This combination mixed with alcohol or ether makes an explosive or inflammable mixture. Approximately from one to twenty per cent of alcohol vapor or ether vapor mixed with oxygen will explode when ignited; that if the gas mask had been washed with alcohol directly before the operation and if all the alcohol had not previously evaporated it "might be possible" that it would make an explosive combination when mixed with nitrous oxide and oxygen. He testified the heating of the nitrous oxide would not give it an explosive character. It is apparent from his testimony and other testimony in the case that the question as to whether the nitrous oxide was or was not heated sufficiently or at all at the time the conversation took place related by plaintiff, had nothing to do with the explosion, and the evidence is uncontradicted that the nitrous oxide and oxygen were working properly at the time of the explosion for the reason that plaintiff was under the influence of it and had been for sometime.

The evidence shows that the face mask is cleaned after each operation by the use of soap and water or alcohol. This Heidbrink apparatus had been used at another operation by Dr. Hallberg twenty minutes prior to the operation on plaintiff. After the first operation the inside and outside of the face mask were wiped out and cleaned with gauze saturated with alcohol. Alcohol is very volatile and after being put upon the apparatus in this way will evaporate in four or five minutes. The tube attached to the face mask is cleansed or washed out by turning on the nitrous oxide gas and allowing it to run through the tube. Dr. Cross, testifying on behalf of

plaintiff, stated that he would have expected that "if an explosion occurred after the patient was under a complete anaesthesia, anything that had been lingering in that tube before the doctor began giving the anaesthesia would have been entirely washed out."

There was no evidence that there was any ether used in connection with this operation. While the Heidbrink apparatus being used by Dr. Hallberg had an ether attachment, the same was not on the machine at the time of this operation. After the explosion when plaintiff was taken to her room in the hospital Dr. McAlester, an eye specialist, was called. He testified that when he arrived plaintiff "stated she had a burn from ether and I found her face red. She did, or someone told me she had a burn. I don't remember who it was. And I was called to see her on account of a burn on her face and her eyes." "They said she had a burn; someone told me; I don't remember whether it was Mrs. Wilt or the nurse or who it was."

"Q. Didn't you, when you started out say that you had been told it was, an ether burn? A. It is my recollection that someone said it was an ether burn." All this was unobjected to but we do not think that this evidence rises to the dignity of evidence showing that ether was being used in connection with the operation. The doctor was called to treat the patient and did not know the nature of the burn when he got there but according to his "recollection" someone (he did not know who) told him that the patient had an ether burn. Plaintiff did not attempt to testify, or anyone else, that she suffered from an ether burn. This testimony is so clearly of a hearsay nature and so indefinite that we do not think it has any probative force to show that ether was being used in connection with the anaesthetic. Plaintiff did not testify that she was nausea immediately after coming from under the effects of the anaesthetic, but the testimony is that nausea follows the administration of nitrous oxide as an anaesthetic as well as ether, but does not follow the former as often as the latter.

In rebuttal an electrical expert testified on behalf of plaintiff stating that there was a likelihood of electric sparks passing from the nose of the patient to the nose piece, but he stated that he knew nothing about the Wampler transformer but was acquainted with the Wappler machine and that of this latter kind of a machine "there are one or two models put out without that being a conductor" (the nose piece.)   The evidence shows that the nose piece being used in this operation was of rubber and not a conductor.

Dr. Cross testified for plaintiff and stated that each batch of nitrous oxide manufactured by the Kansas City Oxygen Gas Company was tested in his laboratory; that this gas as manufactured contained impurities but not of sufficient quantity or quality to make the mixture explosive.   However, he testified that not all of these gases were tested by him or were tested at all times under his personal observation; that he had a number of young men working in his office who would do this testing.   "Q. Some are quite young men? A.   Most of them are young men." "Q. Just out of school, and some have not finished school? Isn't that true? A.   Yes, sir." "Q. Some of them are students up here at the medical college? A.   No:  I don't happen to have any students at all." "Q.  Never did have any students? A.   Well, there may be some night students:  I don't know—"

Dr. Cross first testified that if the impurities causing the explosion had come from the gas tanks containing nitrous oxide and oxygen gas furnished by the Kansas City Oxygen Gas Company that he would "expect" the explosion to have been communicated back into the tank and that the tank would have exploded because the mixture in the tank would be the same as that on the outside in the tube.   He later changed this, and he was asked—

"Q.  Now, in the light of your knowledge of the character of these chemicals, state what would be the situation as to the relative character of the mixture as to its being explosive or otherwise where the explosion was

confined to the face mask and a portion of the tube? A. Under those circumstances I do not believe that the gas issuing through the tube was of an explosive nature until it practically reached its exit—the face mask. Because if it had been explosive it would have blown up the tubes at least back to some point where the explosive mixture was very greatly cooled off.''

That is to say if the mixture coming from the tanks had been explosive, it would have blown up the tubes only back to a point where the mixture was greatly cooled off.

There was testimony on the part of defendant that the Kansas City Oxygen Gas Company at one time had furnished a doctor a gas tank labeled ammonia which contained noxious acid. There was evidence that an operation of this kind had been made under the same conditions and a Heidbrink machine had been used with nitrous oxide and oxygen in the same manner without any untoward happening. The operation, made without mishap twenty minutes previous to the one on plaintiff, was carried on with apparently the same gas tanks in connection with the anaesthesia as those used in giving plaintiff the anaesthetic, but there is no evidence that electricity or other agency of ignition was used in the previous operation. There was also testimony that the manner in which the anaesthetic in plaintiff's case was administered and the operation being done, was in a manner recognized by the medical profession to be proper.

We think under this testimony the cause of the explosion is left largely to conjecture and speculation. Defendants made no effort to explain the explosion but contented themselves by showing that proper machines were being used and that the anaesthetic was being administered and the operation carried on in the proper manner and in a way that physicians had often done before and afterwards without any untoward occurrence, and that they did not know why the explosion occurred. Plaintiff relies upon the *res ipsa loquitur* doctrine and made only slight effort to show the cause of the explosion on the

theory that the duty was upon the defendants to explain this unfortunate happening.

However, it is apparent from the record that the explosion occurred by reason of the fact that some carbon or foreign substance had gotten into the nitrous oxide and oxygen gas being used. Whether these substances were in the tanks furnished by the Kansas City Oxygen Gas Company or whether they were introduced into the face mask or tubes through the carelessness of the anaesthetist, is a matter of speculation. A more plausible theory of the cause of the explosion is that a foreign substance was introduced into the gases being used by the manufacturers. We say this for the reason that the uncontradicted evidence shows that there was no ether being used and while alcohol had been used twenty minutes before it would have evaporated by the time of this explosion, and even if it would not, or was used nearer the time of plaintiff's operation, the testimony of plaintiff's expert chemist was that any foreign vapor in the tube would have been cleaned out or removed between the time the gas was first turned on and the time plaintiff was put to sleep. The evidence shows that ten minutes elapsed between the time the gas was turned on and the explosion. The fact that plaintiff succumbed to the anaesthetic shows that the nitrous oxide was working properly. No other foreign agency that could have gotten into the gases being used is suggested either in the record or in the briefs, and it is difficult to see, under the testimony, how these agencies could have caused the explosion unless they were inserted, shortly before or at the operation, by the defendants, or either of them, somewhere in the tubes or receptacles of the Heidbrink apparatus, of which there is no evidence.

It is reasonable to say that the explosive mixture was ignited through an electric spark coming from the Wampler transformer, though, of course, it is possible that there was a short circuit in the wire attached to the nitrous oxide chamber of the Heidbrink machine, and that a spark came through this machine and through the

wiring that reinforced the tube attached to the face piece or mask, although in view of the fact that the explosion occurred the moment the electrode of the Wampler apparatus was applied to the body of plaintiff, this latter explanation as to the source of the ignition would seem to be improbable. In fact plaintiff in her brief in arguing that Dr. McCallum should be held liable for the explosion, states that the spark came from the Wampler machine.

We are unable to see upon what theory the doctrine of *res ipsa loquitur* can be applied in this case. Unquestionably the duty owing by the defendants, or either of them, to plaintiff was that of ordinary care. [Spain v. Burch, 169 Mo. App. 94, 107.] "By the eight of authority mere proof of an explosion does not create a prima-facie case of negligence . . . no presumption of negligence arises in cases of injuries from defective machinery or other appliances, where the thing is not inherently dangerous, or where the cause of the accident is a matter of conjecture." [29 Cyc. 595.]

The apparatus being used by defendants undoubtedly comes under the head of complicated machinery. Their construction and use are technical and the phenomena experienced in connection with their operation could be only understood by experts. Judge ROMBAUER in the case of Breen v. St. Louis Cooperage Co., 50 Mo. App. 203, 214, which is the leading case upon the subject in this State, says:

" . . . the rule of *res ipsa loquitur* cannot be applied with any sense of reason to a case of complicated machinery, nor can the jury, from the mere fact that some defect exists in some part thereof, conjecture not only that such defect was the direct and immediate cause of the accident, but also that it was the duty of the defendant to foresee such conjectural result and guard against it." [Ramovich v. Const. Co., 264 Mo. 45, 52, 53.] How can we hold that these machines were so simple that judges as laymen can say that the mishap "speaks for

itself?" In McGrath v. Transit Co., 197 Mo. 97, 104, it is stated:

"This is not a case, under the facts disclosed, where *res ipsa loquitur* applies. It has been said that there are but two classes of cases wherein this doctrine can be invoked: '(1) When the relation of carrier and passenger exists and the accident arises from some abnormal condition in the department of actual transportation; (2), where the injury arises from some condition or event that is, in its very nature, so obviously destructive of the safety of person or property, and is so tortious in its quality as, in the first instance, at least, *to permit no inference save that of negligence* on the part of the person in control of the injurious agency.' [Benedick v. Potts, 88 Md. 52.]" (Italics ours.)

In the absence of fact from which we could say that the explosion was one that according to ordinary experience does not happen if the apparatus were being operated with proper care, the doctrine could not apply. [Trotter v. St. Louis & Sub. Ry. Co., 122 Mo. App. 405, 412.] The doctrine itself is well recognized and of long standing, but the difficulty, as commented upon in Klebe v. Distilling Co., 207 Mo. 480, 487, lies in applying it to a given state of facts.

Does the mere happening of the explosion under the circumstances in the case at bar show that, according to ordinary experience, it would not have happened if defendants had exercised the proper care? We think not. If the explosion was caused by improper ingredients mixed with the nitrous oxide and oxygen by the manufacturer, a reputable concern, then the defendants or either of them, would not be liable in this case. The strongest theory that can be advanced from the evidence that appears in this record is that this is where the harmful mixture occurred. To say, as plaintiff contends, that defendants were under the obligation to see that the gases contained in these receptacles did not contain any foreign substance, would be placing upon the defendants the burden of exercising more than ordinary care. They

were not supposed to be expert chemists and as men exercising the care that individuals in their position ordinarily do, would not be expected to have the contents of the gas containers analyzed or tested before using the same, especially in view of the fact that the gas had been purchased from a reputable manufacturer of such chemicals.

While perhaps not exactly in point, this case may be compared with those where a retailer sells articles purchased of a reputable manufacturer and by ordinary care could not have discovered latent defects therein but because of such defects the purchaser suffers an injury. Such is the case of Schubert v. Clark Company, 49 Minn. 331, where the manufacturer sold a stepladder to a merchant, which was made of defective lumber and was of insufficient strength and these defects were hidden so as not to be discovered by the retailer by the exercise of ordinary care, and the retailer sold the stepladder to plaintiff, who was injured. It was held, at l. c. 340, that the retailer was not "an intervening wrongful agency." In Louis v. Terry, 111 Calif. 39, where plaintiff rented a room from the purchaser of a folding bed and was injured by the falling of the upright portion of the bed and was permitted to recover against the tradesman who sold the bed to her landlord. In this connection see also Casey v. Wrought Iron Bridge Co., 114 Mo. App. 47; Trafton v. Davis, 86 Atl. (Me.) 179, 182; Clement v. Rommeck, 113 N. W. (Mich.) 286.

We realize the difficulty with which plaintiff may be confronted in proving her case. She was unconscious and did not know the cause of the explosion. It may be that she had no friend present or other person that she could rely upon as a witness, while defendants were in immediate charge of the anaesthetic apparatus and the cauterizing machine. The evidence does show there was a fourth party present. However, the fact of the occurrence, as before stated, cannot make out a prima-facie case in favor of plaintiff. She must prove her case by alleging and showing specific acts of negligence on the

part of the defendants. While this may be difficult under the circumstances, and it may be impossible, the experience of those engaged in the legal profession has taught them, too often to their sorrow, that many a case that seems to be a perfect one must fail on account of the inability of plaintiff to procure the evidence to prove the case. If plaintiff has a good cause and cannot prove it, that is, indeed, unfortunate but it does not give ground for a case of *res ipsa loquitur*. As was said in Quinn v. McCallum, 178 Mo. App. 241, 143, "When plaintiff comes into court, he assumes the burden of showing himself entitled to relief. If, in fact, he is entitled to such relief and yet cannot prove it . . . it is his misfortune."

We have carefully examined the cases cited by plaintiff and find that they do not help her. Most of them are passenger cases or cases of electrocism and the like where the defendants were required to exercise the highest degree of care and where the occurrence carried with it a strong inference of negligence on the part of the defendant. The fact that a contract relation existed in the case at bar did not require defendants to use more than ordinary care.

The judgment is reversed and the cause remanded. All concur.

## On Rehearing.

ARNOLD, J.—After hearing the very able presentations of counsel we are unable to say that any other conclusion is tenable than that reflected in the original opinion. Our attention has been directed to the case of Pate v. Dumbauld, No. 23,253, recently decided by the Supreme Court and not yet published. This was a malpractice case from Jasper County, and while perhaps not on all fours with the case at bar, the conclusions of the court apply directly and control herein.

It is well to note that in the case under consideration plaintiff seeks recovery wholly upon the doctrine of *res ipsa loquitur,* and pleads no specific acts of negligence.

Therefore if plaintiff is entitled to recover it must be under the rules applicable to a case under that doctrine.

Referring to the opinion of the Supreme Court in the Pate v. Dumbauld case, it is clearly the intention of the court to hold that in this class of cases no recovery can be had unless the plaintiff produced ''substantial evidence that appellant was derelict in respect to his professional duty in the case.'' In the case at bar there is no showing that defendants were derelict in their duty, nor is it so charged. There is no plea in the petition that defendants were not possessed of the ordinary and average skill of men of their professions in the community. Absent evidence to the contrary, the law presumes that defendants did their duty properly. [Lenox v. Harrison, 88 Mo. l. c. 496; Mathias v. O'Neill, 94 Mo. 520, 528; Yarnell v. Railroad, 113 Mo. 570, 579; Hartwell v. Parks, 240 Mo. 537, 544; Haggard v. McGrew Coal Co., 200 S. W. l. c. (Mo.) 1074; Wells v. Wells, 279 Mo. 57, 69; 213 S. W. l. c. 833; B. C. F. G. Ass'n. v. Zollman P. Co., 200 S. W. (Mo.) 911; State v. McNeal, 237 S. W. l. c. (Mo.) 741.]

Our original opinion will be adhered to, the judgment reversed and the cause remanded for another trial.

All concur.