Helen WILLIAMS, Appellant,

v.

G. L. CHAMBERLAIN, Respondent.

No. 46464.

Supreme Court of Missouri,

Division No. 2.

Sept. 8, 1958.

Motion for Rehearing or to Transfer to Court En Banc Denied Oct. 13, 1958.

Samuel B. Murphy, Cook, Fairfield, Howard & Murphy, St. Louis, Forrest L. Hill, Fayette, Missouri, for appellant.

Schaumburg & Martin, W. H. Martin, Boonville, Wilbur F. Daniels, Fayette, for respondent.

EAGER, Judge.

This is an action for damages, of the type colloquially known as a malpractice case; the amounts prayed were $35,000 actual damages and $25,000 punitive damages. At the close of plaintiff's evidence the court directed a verdict for the defendant, and, after an unavailing motion for new trial, plaintiff has appealed. Since the sufficiency of the evidence is the principal question involved, a detailed statement of the evidence will be necessary.

■ Plaintiff, a negro woman 42 years of age, worked as a domestic in and about New Franklin, where she lived. The suit arises from the fact that she developed a severe case of tetanus. On April 8, 1954, she was hit on the head with a metal chair by her husband, in the course of an argument about his drinking. This blow raised a hematoma about half the size of a lemon in the right parietal area; in the center of the hematoma was a clean looking cut about an inch long. She was taken very shortly to the office of defendant, who had long been her family physician, and who was a medical doctor in general practice in New Franklin and vicinity. In connection with the subsequent developments we shall consider the testimony favorable to plaintiff, there being some conflicts of more or less materiality. According to plaintiff's testimony she was attended by the defendant on April 8, 10, 13 and 15, and three times on Saturday, April 17; on all of these occasions but the last one she went to defendant's office. She stated that on the first visit defendant did not cut her hair, remove any skin, or "clean out" the wound, but that he separated or parted her hair, put some salve on a pad which he applied to the wound, and then bandaged the wound and head; that he might have used a piece of gauze to swab the wound; and that he also gave her a "shot" at that time. It was further shown without contradiction that the "shot" was an injection of 1,500 units of tetanus antitoxin. On Saturday, the 10th, defendant re-dressed the wound, but plaintiff did not recall whether she got any more "shots." On the 13th defendant again re-dressed the wound, but did nothing else. She testified that on April 15th her face seemed to be somewhat swollen under the bandage, and it seemed to be a little "difficult" to open her mouth; she located the area of difficulty as her right jaw and ear; she testified at the trial that she then told defendant that her neck was stiff and that her jaw hurt, but that he told her that it "was a nerve" and to go home and rest. She continued to work up until Saturday, April 17th, but stated that on that day she was unable to work, and that there was an odor about the wound; defendant then removed the bandage, stated that there was a little inflammation, had her get the hair clipped around the wound, and gave her two blue pills with which to have her hair washed in boiled water. After her hair was thus cut and washed, and on the same afternoon, defendant re-dressed the wound; on this same day defendant gave her some "shots," but she could not recall just how many; she testified that her neck and jaw were "uncomfortable," that her face was swollen "in here," that she could not tell whether her neck was swollen, and that her "jaw" was "difficult." We are unable to tell what complaints she may have then made to defendant, but she testified that she did tell him that her face was hurt-

ing. When she returned home she lost her power of speech for a brief time, and defendant was called to her home; when he arrived she had regained her speech, but she was "beginning to get stiff," mostly in her face and jaw, but she did not remember whether she then told the doctor about the stiffness; defendant then gave her another "shot," and told her she was nervous and that she was having too much company. On Sunday, April 18th, she was up and down, at home; her brother had come from Illinois, and she became so stiff and sore that evening that she and her brother decided that she should go to a hospital. The brother testified that he talked to defendant on Sunday about hospitalization (which defendant denied), and that the latter said he didn't think "she was too bad," but that he would have a bed ready if they wanted to go. Plaintiff was taken in an ambulance to St. Joseph's Hospital in Boonville at about 2:00 a. m. on Monday, April 19th, and a nurse then notified defendant by phone. He inquired as to her complaints and prescribed a sedative; he first saw her there at about 7:00 a. m. By that time plaintiff was very ill; the nurses' notes show that at 5:15 a. m. she stated that she could not open her mouth. Various laboratory tests were made and medications given, beginning immediately, including a spinal tap to eliminate the existence of meningitis, a skull X-ray, and repeated administrations of pencillin, sedatives and glucose. Two other physicians were called in consultation. Defendant became suspicious of tetanus about 8:00–8:30 a. m., and a diagnosis was made of probable tetanus at about 11:00 a. m. As soon as sufficient tetanus antitoxin could be procured for a large dosage, its administration was begun, actually about 1:30 p. m. This had to be collected at first in many small prophylactic doses from various drug stores in Boonville and Columbia until larger amounts could be procured elsewhere. About 6:00 p. m. defendant attempted to inject antitoxin into plaintiff's spinal canal; she was placed in an "arched" position to separate the vertebrae; when the needle had been partially inserted, plaintiff gave a "sudden, unexpected jerk," causing the needle to break before it had actually gone into the spinal canal, and leaving the proximal end of the broken portion about a quarter of an inch beneath the surface of the skin. Such accidents are by no means unknown in the medical profession. No effort was made at that time to remove the broken portion of the needle, a piece perhaps six centimeters in length. Plaintiff remained acutely and seriously ill with tetanus for several weeks, receiving repeated large dosages of the antitoxin intravenously and much other medication; she was unable at the trial to recall much concerning the first weeks of her hospitalization. She received very frequent doses of sodium amytal for pain. The "History and Physical Examination" on the hospital record showed: "onset of neck and mouth complaint, about 24 hours before admission * * * head and neck arched back as in meningitis." Defendant was the attending physician throughout plaintiff's hospitalization and for about four months thereafter. Plaintiff did not go subsequently to any other doctor for treatment. She stated that she first learned of the breaking of the needle from one of her attorneys.

On May 16th Dr. Chamberlain had X rays taken of the lumbar spine and the broken portion of the needle was located, marked and removed. The X-ray report and the X-ray films became and are parts of the hospital records. No separate notation was made on the hospital chart of the breaking or of the removal of the needle. On this date, May 16th, the nurses' notes showed the existence of a spot on plaintiff's "spine" about the size of a half dollar which was painful to touch, and that defendant was notified. However, there was no evidence to show that this spot was actually the site where the broken needle was located, or from which it was removed.

The defendant was placed on the stand by plaintiff's counsel. In considering the sufficiency of the evidence we may look also at his testimony, in so far as it is not in conflict, factually, with the testimony of plaintiff or her lay witnesses. Thus, defendant's testimony showed the following facts: that a 1,500 unit prophylactic injection of anti-tetanus serum was administered to plaintiff on her first visit, and that this was the usual and ordinary dosage; that he gave plaintiff various injections of penicillin, which is not only a general preventative, and cure, of infections, but is specifically effective as a preventative of tetanus; that plaintiff's wound was a clean cut, almost as if made by a knife; that plaintiff did not come back as often as directed for penicillin injections; that pus is no indication whatever of the existence of tetanus, and pus usually develops in a "raw incision"; that pus consists merely of white blood cells combating an abnormal condition; that defendant at no time noted any odor from the wound; that some swelling in the cheek and jaw could normally result from plaintiff's injury and was of no particular significance, although defendant personally noted no increase in swelling; that he did not recall whether plaintiff complained that her jaw or neck were stiff; that he made no particular inquiries about "stiffness" because he did not want to suggest anything to one of a nervous nature; that tetanus can flare up "overnight," and that at no time when he saw plaintiff prior to her hospitalization did her symptoms or appearance indicate to him that she had tetanus or that she was otherwise seriously ill.

In addition to the defendant's own testimony, there was medical testimony from Dr. W. A. Bloom of Fayette, a physician of 34 years' practice; he had been appointed, during the trial, to examine plaintiff as the court's witness. When plaintiff's counsel put him on the stand his testimony became a part of plaintiff's case. The expert evidence as a whole fairly showed: that tetanus is a rather rare disease in this locality, defendant having had two cases and Dr. Bloom three in their long periods of practice; that it is caused by a spore organism which develops more often in puncture wounds because of the absence of oxygen; once present, it might develop faster in necrotic or injured tissue; the organism is usually found in dirt, around barns, etc., and a physician does not ordinarily assume that a blow received in the house would cause it. The typical symptoms of tetanus are locked jaws, the neck drawn back, and rigid, contracted muscles all over the body. It operates directly upon the muscles and kills by convulsive contractions or spasms of the chest muscles; pains in the back are a part of the disease, as the largest muscle in the body extends along the spine; there is usually generalized pain in the muscles. Large therapeutic doses of tetanus antitoxin are usually administered as soon as a definite diagnosis is made, although considerable recent medical authority supports the use of penicillin, both as a preventative and as a cure. The evidence further showed: that a physician must treat the conditions resulting from a wound according to the precise, individual situation as presented to him, and this is also true where there are such symptoms as stiffness of the neck or jaw, bad odor, pus, etc., following an injury; that the latter symptoms would indicate the probability of a secondary infection rather than tetanus; and that a diagnosis of tetanus should certainly be made before large doses of the antitoxin are administered.

The medical testimony further was, in substance: that the presence of the piece of broken needle might or might not cause symptoms; it might cause pain and might create a "sore area" or cause infection; that, however, such a piece of needle should not be removed when the patient was seriously ill with tetanus; that the most effective way to administer the antitoxin is in the spinal canal; that certain of the conditions found by Dr. Bloom upon his examination (which included a slight stiffness in the neck, a somewhat limited grip in the

right hand, some small lumps on parts of the body, possibly a little instability when bending "too far" to the right, and a slightly diminished reflex in the right foot) are probably results of the original head injury and of a resulting blood clot, and not of the presence of the broken needle fragment; that the time for removal of such a fragment is a matter of judgment in each individual case, and here it was Dr. Bloom's opinion that in view of plaintiff's serious illness, it was "the better practice to leave it alone until there's an opportune time to remove it." In this connection the defendant testified that he did not forget or overlook the presence of the needle, but that he intended to take it out when plaintiff's condition permitted; this was done at a time when she was complaining of her back, but that she still had, even then, some rigidity in her back, and that there was no "spot" on the skin at the place where the needle fragment was located. Other facts will be referred to as the occasion may arise in the course of this opinion.

Plaintiff did not charge that defendant failed to possess the requisite knowledge or skill; hence, we are not concerned with that issue. She did charge failure to use and exercise the necessary care and skill, which is a charge of negligence. Therein, her charges were and are essentially as follows: (1) that defendant failed to administer adequate and timely tetanus antitoxin; (2) failed to properly cleanse and treat the wound; (3) failed to make a timely diagnosis of tetanus and to administer appropriate treatment; (4) failed to hospitalize plaintiff; and finally (5) that he broke off the needle in plaintiff's back and failed to remove the broken fragment or advise plaintiff thereof, and failed to make any notation thereof on the chart. The petition also contains various allegations of wantonness and willfulness, of which there is not the slightest evidence; these we shall disregard. The answer consisted of denials except for an admission that the needle was broken and that a portion of it remained in plaintiff's back for a time.

■■■ While the rule has been stated with slight variations from time to time, it may properly be said that a physician is required to use and exercise that degree of care and skill used and exercised by the ordinarily skillful, careful and prudent physician acting under the same or similar circumstances. See, generally: Sennert v. McKay, Mo., 56 S.W.2d 105; Gore v. Brockman, 138 Mo.App. 231, 119 S.W. 1082; Owens v. McCleary, 313 Mo. 213, 281 S.W. 682; Seewald v. Gentry, 220 Mo.App. 367, 286 S.W. 445; McDonald v. Crider, Mo.App., 272 S.W. 980; Vanhoover v. Berghoff, 90 Mo. 487, 3 S.W. 72; Hales v. Raines, 146 Mo.App. 232, 130 S.W. 425; Cazzell v. Schofield, 319 Mo. 1169, 8 S.W.2d 580. In stating or approving definitions, however, our courts have often included such additional terms as "in * * * similar communities" (Sennert v. McKay, Mo., 56 S.W.2d 105) or "practicing in similar localities" (Reed v. Laughlin, 332 Mo. 424, 58 S.W.2d 440; Hales v. Raines, 146 Mo. App. 232, 130 S.W. 425; Cazzell v. Schofield, 319 Mo. 1169, 8 S.W.2d 580). Actually, there should be no difference in the "care" required of a physician anywhere; the idea of a differentiation in locality seems to have originated in years past from the known fact that physicians in the more populous communities have had greater opportunities for continued education and for advancement in new ideas and research. Since the physician everywhere is required to exercise not only reasonable "care," but also the "skill" which he possesses (Sennert v. McKay, Mo., 56 S.W.2d 105; Rothschild v. Barck, 324 Mo. 1121, 26 S.W.2d 760), we have no quarrel with the inclusion of the element of "similar localities" in the definitive requirement and probably it is properly included. So long as the physician properly exercises his skill and the requisite degree of care, he is not liable for an honest error of judgment. Gore v. Brockman, 138 Mo.App. 231, 119 S.W. 1082; Gottschall v.

Geiger, 207 Mo.App. 89, 231 S.W. 87; Fausette v. Grim, 193 Mo.App. 585, 186 S.W. 1177; Bailey v. St. Louis-San Francisco R. Co., Mo.App., 296 S.W. 477; Snyder v. St. Louis Southwestern R. Co., 228 Mo.App. 626, 72 S.W.2d 504; Vanhoover v. Berghoff, 90 Mo. 487, 3 S.W. 72. Nor, having so acted, is he liable merely because of a bad result. Mann v. Grim-Smith Hospital and Clinic, 347 Mo. 348, 147 S.W.2d 606; Connelly v. Cone, 205 Mo.App. 395, 224 S.W. 1011; McDonald v. Crider, Mo.App., 272 S.W. 980. It was stated by Judge Taft (later Chief Justice) in the case of Ewing v. Goode, C.C.S.D.Ohio, 78 F. 442, 443, that if a failure to cure or a bad result were held to be evidence of negligence, then, " * * * few would be courageous enough to practice the healing art, for they would have to assume financial liability for nearly all the 'ills that flesh is heir to.' " The burden is upon a plaintiff to prove negligence. Sibert v. Boger, Mo., 260 S.W.2d 569; Small v. Wegner, Mo., 267 S.W.2d 26, 50 A.L.R.2d 170; Telaneus v. Simpson, 321 Mo. 724, 12 S.W.2d 920; Nevinger v. Haun, 197 Mo.App. 416, 196 S.W. 39. And a plaintiff's burden embraces not only proof of negligence but proof also that the negligent act or acts caused the injury. Pedigo v. Roseberry, 340 Mo. 724, 102 S.W.2d 600; Nevinger v. Haun, 197 Mo.App. 416, 196 S.W. 39. Generally, the doctrine of res ipsa loquitur is not applicable in malpractice cases. Wilt v. McCallum, 214 Mo.App. 321, 253 S.W. 156; Hill v. Jackson, 218 Mo.App. 210, 265 S.W. 859; Johnston v. Rodis, D.C.D.C., 151 F.Supp. 345. Particularly is this true where, as here, plaintiff alleges specific negligence. Pate v. Dumbauld, 298 Mo. 435, 250 S.W. 49. In at least the great majority of malpractice cases a submissible case may only be made by expert medical testimony for otherwise a jury may not know (or guess) whether the defendant's acts did or did not conform to the required standards. Pedigo v. Roseberry, 340 Mo. 724, 102 S.W.2d 600; McDonald v. Crider, Mo.App., 272 S.W. 980; Hopkins v. United States, D.C.W.D.

Mo., 152 F.Supp. 473. In the case last cited the court said in part, loc. cit. 476, 477: "A plaintiff in a malpractice action assumes a very heavy burden where the basis of recovery is predicated on an attack on the technique and skill exercised by an operating surgeon or on a charge that he failed to exercise reasonable judgment. In the absence of most unusual circumstances it is a burden that cannot be discharged in normal course by lay testimony. * * * When plaintiff fails to show by calling an expert that the care given by defendant and its agents falls below the required standard of the school of medicine to which he belongs, and fails to show that Dr. Brackett neglected to use standards of skill and treatment required of others in the area, then plaintiff has failed in her burden." The cases where a physician or surgeon has left foreign objects in operative cavities fall into an entirely different class. See: Null v. Stewart, Mo., 78 S.W.2d 75; Sontag v. Ude, 191 Mo.App. 617, 177 S.W. 659 (both cited by plaintiff); Hilton v. Mudd, Mo.App., 174 S.W.2d 31; Ingram v. Poston, Mo.App., 260 S.W. 773; Johnston v. Rodis, D.C.D.C., 151 F.Supp. 345. There, proof of such fact alone is generally held to establish a prima facie case of negligence, and the defendant is put upon his proof, although negligence is still the ultimate test. Hilton v. Mudd, Mo.App., 174 S.W.2d 31.

There is no medical evidence whatever in the present case to show that a 1,500 unit injection of anti-tetanus serum was inadequate as a prophylactic dose, under the circumstances present. In fact, this was not the type of injury where tetanus would have been strongly suspected, and it is not definitely established that it would have been negligent to omit the prophylaxis entirely. The first claim of negligence fails. In so far as this claim may concern subsequent acts and treatment by the defendant, these will be considered under our discussion of a claimed failure to diagnose and properly treat.

The mode of treatment of plaintiff's head wound was a matter resting largely in the defendant's judgment. True, she testified that he merely parted her hair and did not cut it (which he denied), that he removed no skin, that he might have used a piece of gauze to swab the wound, but that, according to her own interpretation, he did not "clean out" the wound or use any water, and that he applied salve or ointment on a pad and bandaged the wound and head. This is supplemented by defendant's uncontradicted testimony that the wound was a clean cut, almost as if made by a knife, that he applied a sterile dressing, and that he re-dressed the wound thereafter on several occasions. There was other testimony of the defendant which directly contradicted plaintiff's assertions, supra, but we may not consider this on the submissibility of her case. There was no evidence showing the necessity of removing any "skin" or tissue, and we may fairly infer from the uncontradicted testimony that the wound was sterilized and, in a medical sense, "cleansed"; some of the assertions in plaintiff's petition on this phase of the case are mere unsubstantiated conclusions. Each case presents its own set of circumstances to a physician and there is no "cut and dried" (Dr. Bloom) rule applicable. No negligence was proven on this element of the case. Much of the cross-examination directed to Dr. Bloom was wholly inapplicable to the facts proved here. And any finding of causal connection between defendant's treatment of this wound and the development of tetanus would rest upon pure speculation.

The substantive questions remaining are: (a) the alleged failure to diagnose and treat tetanus promptly; and (b) the claims of negligence arising from the broken needle. The making of a diagnosis is largely a matter of judgment. Even if there be an erroneous or mistaken diagnosis the mistake must be a negligent one to create liability. Gottschall v. Geiger, 207 Mo.App. 89, 231 S.W. 87, 95; Trask v. Dunnigan, Mo.App., 299 S.W. 116, 117;

McDonald v. Crider, Mo.App., 272 S.W. 980, 981–982; Sibert v. Boger, Mo., 260 S.W.2d 569. This wound was not of the type in which the development of tetanus would be strongly suspected; it was an open, cleanly cut wound incurred inside a dwelling house. However, defendant administered immediately the ordinary prophylactic dosage of anti-tetanus serum. Plaintiff testified, somewhat vaguely, to the existence of swelling "under the bandage" about April 15th, and to some pain in her jaw and some stiffness in her neck; and (as of April 17th, the last day that defendant saw her) to some swelling of the face and some difficulty or stiffness in her jaw and face. We may concede that she made some complaint of these things to the defendant, though just what complaints and when they were made, are, at best, rather nebulous. This woman had suffered a severe blow on the head which would normally cause various symptoms, including pain and swelling about the head or face, or both. In the opinion of the only independent expert the results of the blow itself, probably through the formation of a blood clot and pressure, were sufficiently serious to cause at least most of the impairments which he found nearly three years later. The conditions which defendant saw or learned during the ten days of his prehospital treatment would seem to have fallen far short of the recognized symptoms of existing tetanus, namely: locked jaws, the neck muscles so contracted as to draw the neck back, and rigid, contracted muscles over the body. The symptoms recited to Dr. Bloom by plaintiff's counsel, namely, stiffness of jaw and neck, bad odor, indicated to him a probability of "some secondary infection, not necessarily tetanus." Defendant was administering penicillin which is, in itself, a recognized preventative of tetanus, as well as a curative agent for various and sundry infections; he was not justified in beginning large, therapeutic doses of antitoxin until an actual diagnosis of tetanus was made, for that, in itself, is a serious procedure. Tet-

anus may develop "overnight"; we find no medical evidence here fairly indicating that an ordinarily careful and skillful physician in defendant's place, and under these circumstances, would have made a diagnosis of tetanus earlier and would have begun the massive treatments more promptly. Even after plaintiff entered the hospital, extensive tests and consultations were found to be necessary before a diagnosis of tetanus could properly be made, notwithstanding the fact that the condition had then been developing for perhaps an additional 36–48 hours since defendant saw the patient. On this phase of the case the evidence shows a fair exercise of defendant's best judgment, without proof that the judgment was negligently exercised. We deem it unnecessary to cite again the cases which have already been referred to.

Plaintiff's counsel cites, primarily on the alleged failure to make a timely diagnosis and to treat promptly: Baird v. National Health Foundation, 235 Mo.App. 594, 144 S.W.2d 850; Reed v. Laughlin, 332 Mo. 424, 58 S.W.2d 440, and Richeson v. Roebber, 349 Mo. 132, 159 S.W.2d 658, 141 A.L. R. 1. The facts in those cases differ widely from ours. In the Baird case there was specific expert testimony to establish negligence in the failure to discover the condition, and there were additional elements of negligence consisting of a lack of attention and abandonment. The Reed case was held submissible solely on the theory of abandonment in discharging plaintiff from the hospital prematurely, and in a total lack of attention and care following an operation; also, there was expert testimony to establish negligence. In the Richeson case it was held that defendant's own medical testimony established a submissible claim of negligence upon the factual theory shown by plaintiff's testimony. These cases are not controlling or persuasive here.

■■■■ The breaking of a hypodermic needle in the course of medical or dental treatment is by no means a thing which, in itself, bespeaks negligence. Needles may break from various causes, as from an unobservable and unknown defect in the needle, or from a sudden movement of the patient, as well as from an improper usage or method. And such a break may occur in spite of all the care and skill which a physician or dentist may employ. See Mitchell v. Poole, 229 Mo.App. 1, 68 S.W.2d 833, where a rather full discussion of the subject appears. The mere fact that the needle was broken establishes no negligence. Plaintiff's counsel seem to contend that the administration of antitoxin in the spinal canal was unnecessary; however, such was a recognized method and was said by Dr. Bloom to be the "best way"; defendant can be convicted of no negligence therein on this evidence. Whether or not plaintiff's condition precluded that method was, again, a matter of judgment. The principal contention is that defendant was guilty of negligence in leaving the piece of the broken needle in plaintiff's back and near the spinal canal for a period of approximately 27 days. There was evidence that this piece of needle might cause pain, but not necessarily any severe pain; or, that it might conceivably cause infection (how, is not explained). However, the effects here are not the controlling factor. The question simply is: was defendant justified, as a matter of medical judgment, in waiting as he did to remove this fragment? Any negligence in this connection must be established by expert testimony. We find none. On the other hand Dr. Bloom testified, from the facts related and the X-ray films showing the needle fragment: "I certainly wouldn't attempt to remove a needle with a patient seriously ill as apparently one must be from tetanus. * * * From the history that I've heard, the serious illness of this patient, it would be my judgment that the better practice would be to leave it alone until there's an opportune time to remove it. Q. I understand, but would that mean as much as 30 days in this case? A. Could be." There is no evidence sufficient to establish a submissible case of negligence in this regard.

The reference to defendant's statement that he "could have taken it out sooner, but there was no rush about it" is taken somewhat out of context. This statement was not flippantly made, as we read the record, but it immediately followed defendant's testimony that he intended all along to remove the fragment when plaintiff "got able to," that the first consideration was to save plaintiff's life, and that the "better she was" at the time of the removal the "easier, nicer job" it would be. This was not a case where a patient was abandoned with a needle fragment in his or her body, and without telling the patient or advising further treatment. See Ernen v. Crofwell, 272 Mass. 172, 172 N.E. 73, 69 A.L.R. 1140. In the Poole case, supra, a rather extended period elapsed before anyone dared remove the needle fragment, because of the presence of infection. True, it is ordinarily better procedure to tell the patient; but this must depend somewhat on the circumstances, and here it would not seem to have been useful or prudent to have told plaintiff of the occurrence at the time; in her condition she may not have been able to understand, and if she had done so it could only have agitated her. Likewise, a notation on the chart may be a customary procedure, but the failure to make such notation cannot, in itself, create or support a claim of negligence under the present circumstances. When the fragment was removed the X rays and the X-ray report showing the presence and removal were made parts of the hospital records. We find that no negligence was established in connection with the needle episode. In addition to the Mitchell case, supra, see also Steinmetz v. Humphrey, 289 Ky. 709, 160 S.W.2d 6. The situation in our case is wholly different (Steinmetz case, supra) from those cases in which an operating surgeon leaves a foreign object in the operative cavity, without explanation or effort to remove; it is generally held in such cases that, even in the knowledge of laymen, such an occurrence would not ordinarily happen without negligence.

See, for instance, Null v. Stewart, Mo., 78 S.W.2d 75; Sontag v. Ude, 119 Mo.App. 617, 177 S.W. 659, both cited by plaintiff. We hold that no submissible case was made on the delay in removing the needle fragment.

The only remaining claim of negligence rests in the failure to hospitalize plaintiff. What we have said concerning the matters of diagnosis and judgment and the absence of expert testimony establishing negligence in those particulars, disposes of the contention. Dr. Bloom "might" have hospitalized the patient, depending upon how the situation actually appeared to him at the time. This does not withdraw the contention from the realm of speculation. Nor does the evidence show, without speculation, that the results would have been different had this been done.

One further point is briefed which may be disposed of readily. It concerns alleged errors in sustaining objections of defendant's counsel to hypothetical questions submitted to Dr. Ira J. Hammond, an osteopathic physician who was produced and examined on behalf of plaintiff. Before plaintiff's counsel had concluded his direct examination, the court took the noon recess, and the witness never reappeared; the reason for his absence did not and does not now appear. The court offered to issue an attachment for the witness, but counsel for plaintiff declined this offer. Defendant had conducted no cross-examination, nor had that point been reached. At the conclusion of the plaintiff's evidence the court struck all testimony of this witness on motion of defendant. No objection was made to this action, nor was error therein assigned in the motion for new trial. It is perfectly obvious that under these circumstances there is nothing before us in connection with rulings on questions to that witness. In the cases of Dannefelser v. Weigel, 27 Mo. 45, and St. Charles Savings Bank v. Denker, 275 Mo. 607, 205 S.W. 208, depositions were held inadmissible where the deponent had absented himself so as to preclude all cross-examination, due

either to the fault of the party producing him or of the witness himself. The situation here fully justified the striking of this evidence. Nothing remains for consideration in connection with it.

Finding no error, the judgment for defendant, based upon the directed verdict, will be affirmed. It is so ordered.

All concur.