476 F.Supp. 630 (1979)
Monroe DOSS, Plaintiff,
v.
UNITED STATES of America, Defendant.
No. 78-488C(2).
United States District Court, E. D. Missouri, E. D.
June 27, 1979.
Martin T. Sigillito, St. Louis, Mo., Robert F. Godfrey, Fairview Heights, Ill., for plaintiff.
Bruce D. White, Asst. U. S. Atty., U. S. Dept. of Justice, St. Louis, Mo., for defendant.

MEMORANDUM
NANGLE, District Judge.
Plaintiff Monroe Doss brought this suit pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq., seeking damages for alleged malpractice.
This case was tried before the Court without a jury. The Court having considered the pleadings, the testimony of the witnesses, the documents in evidence, the stipulations of the parties, and being otherwise fully advised in the premises hereby makes the following findings of fact and conclusions of law as required by Rule 52, Federal Rules of Civil Procedure:

FINDINGS OF FACT
1. Plaintiff, Monroe Doss, is a resident of East St. Louis, Illinois. He was honorably discharged from the service of the United States Army in December, 1954, and was entitled to the benefits of treatment at a Veterans Administration Hospital. At all times relevant herein, plaintiff was 48 years *631 old and had only a third grade education. In May, 1977, he was employed as a custodial worker at the Meredith Home in Belleville, Illinois.
2. John Cochran Veterans Administration Hospital, in St. Louis, Missouri, is a hospital operated by the Veterans' Administration Center, a governmental agency.
3. On May 18, 1977, plaintiff was sent home from work because of a swollen right foot; he was not returned to work since that date. On May 23, 1977, when his foot had not improved, plaintiff visited a podiatrist, Dr. Claude Hiles, in East St. Louis, Illinois. The podiatrist took an x-ray and recommended that plaintiff have surgery to remove an excess bone formation in the foot. Plaintiff was unable, however, to afford the operation and hospitalization.
4. On Friday, May 27, 1977, at the start of a holiday weekend, plaintiff went to John Cochran Veterans Administration Hospital for treatment. He was seen as an outpatient by Dr. Loretta Mendoza. Dr. Mendoza's examination revealed that plaintiff had a fast heartbeat, elevated blood pressure and a low-grade temperature. Dr. Mendoza ordered x-rays, and then, as her shift was ending, turned plaintiff over to Dr. Olatta. Dr. Olatta made a provisional diagnosis of chronic osteomyelitis or traumatic arthritis. He referred plaintiff to the orthopedic department, indicating on the records that the examination was to occur within twenty-four hours. Plaintiff's record also reflects that Dr. Olatta checked the box marked "emergency" on the form. Dr. Olatta prescribed the drug, Butazolidin, which reduces swelling, although said drug is not to be used with persons having high blood pressure or a rapid pulse rate. Contrary to Dr. Olatta's orders, plaintiff was not referred to the orthopedic department; instead, he was given an appointment to return on May 31, 1977 and was allowed to return home.
5. On May 31, 1977, plaintiff was seen by Dr. Jon Zoltan, chief resident in the orthopedic clinic. On this date, plaintiff's foot was swollen and shiny; it was also draining slightly. Although Dr. Zoltan noted in the record that there was no drainage on this date, an entry on June 3, 1977 stated "Evaluated in orthopedics three days ago with lot drainage, and keflex ordered empirically". The top of plaintiff's foot was soft. Dr. Zoltan rated the swelling as 3 + on a system of 1 + to 4 +, with 4 + being the most severe swelling. Dr. Zoltan ordered certain tests on this date, including a complete blood count and a sedimentation rate. The sedimentation test was never done. Although the blood count was taken, Dr. Zoltan did not review the results prior to plaintiff's departure. Dr. Zoltan did not perform, nor order, a culture and sensitivity test. He did not aspirate the fluid in the foot for testing, and did not perform an incision and drainage. Plaintiff was given an antibiotic, Keflex, at a dosage far below the minimal strength. He was also given some pain relievers, and told to elevate the foot and apply heat. He was allowed to return home, with a third appointment scheduled for June 6, 1977.
6. The blood test taken on May 31, 1977 but not reviewed by Dr. Zoltan revealed a white blood count of 25,000. This count clearly reveals serious infection. Dr. Zoltan testified that such a count could indicate leukemia, acute appendicitis or osteomyelitis.
7. On June 3, 1977, plaintiff was rushed to the hospital because his foot had "burst" open and was draining. Dr. Zoltan admitted plaintiff to the hospital on that date. He contacted the surgical service and Drs. Caplin and Stechenberg were sent to examine plaintiff. After an examination and telephone consultation with Dr. Cheung, an attending physician, it was agreed that plaintiff should undergo surgery for debridement of the devitalized tissue, with the possibility of amputation, depending upon the condition discovered in surgery.
8. Dr. Caplin obtained surgical consent from plaintiff. He stated that it is his policy and practice to fully explain surgery prior to obtaining consent, although he was unable to recall the details of this conversation with plaintiff. Plaintiff stated that he was in pain at the time and had been assured *632 by a nurse that his leg was not going to be amputated. Plaintiff, however, was not receiving any drugs at the time of the conversation with Dr. Caplin, and was quiet and withdrawn thereafter. The Court finds that plaintiff was fully advised of the risks and nature of the surgery.
9. In surgery, Dr. Caplin made an incision on the dorsum of plaintiff's foot. There was no bleeding and Dr. Caplin found the presence of gas gangrene. His notes indicate that the infection had spread to 3 cm. above the malleoli. Drs. Caplin and Stechenberg discussed the condition, and determined that the foot was dead. As the infection had spread, a below-the-knee amputation was deemed necessary.
10. After surgery, the pathologist found no evidence of necrotic tissue above the ankle. He found that the blood vessels were not occluded, and that what had the appearance of gangrene did not extend to the ankle. The pathologist found the cause of the osteomyelitis to be staphylococcus.
11. Plaintiff's hospital records are poor, having been carelessly maintained. Several inconsistencies appear in the record, including that notation on May 31, 1977 that there was no drainage of the foot, followed by an entry on June 3, 1977, stating that there had been drainage on May 31st. Tests which were ordered were not done. References to other departments were ignored. Plaintiff was released before tests results were returned.
12. While this Court is unable to conclude that the amputation on June 3, 1977 was unnecessary or more extensive than necessary, it is clear that on May 27, 1977 and May 31, 1977, plaintiff was not provided with the reasonable standard of care to be expected. Had the doctors who treated plaintiff on these dates used and applied the degree of care, skill and proficiency commonly exercised by the ordinarily skillful physician practicing under similar circumstances, plaintiff's condition would not have deteriorated to the point where amputation was necessary. The reference to orthopedics should have been accomplished, as ordered on May 27, 1977. Instead, plaintiff was allowed to return home, and was given an inappropriate prescription. Additional tests should have been ordered on May 31, 1977, in view of the seriousness of plaintiff's condition on that date. Instead, not even those minimal tests which were ordered were completed, and the results of one test which was performed was not even reviewed by the attending physician prior to plaintiff's release. No attempt was made to discover the nature of the infection which caused the swelling, although the blood test of May 31, 1977 clearly revealed the presence of an infection.
13. At all times relevant herein, Doctors Mendoza, Olatta, Zoltan, Caplin, Stechenberg and Cheung were employees of defendant, United States of America, and were acting within the scope of their employment at the John Cochran Veterans Administration Hospital.
14. In August, 1977, plaintiff was fitted with a prosthetic device and is able to ambulate well. Nevertheless, plaintiff has not returned to work. In 1975, plaintiff earned $5,850.00. In 1976, he earned $6,719.00. In 1977, plaintiff earned only $3,102.00, and has not earned any money since then.
15. On November 2, 1977, plaintiff filed an administrative tort claim with the Veterans Administration in St. Louis, Missouri. On March 10, 1978, the claim was denied. This suit was timely filed.
16. The Court finds that plaintiff sustained damages in the sum of $95,000.00 as a result of the doctors' failure to properly attend to plaintiff on May 27 and May 31, 1977.

CONCLUSIONS OF LAW
This Court has jurisdiction of the subject matter and the parties to this suit in accordance with 28 U.S.C. § 1346.
The liability of the United States is to be determined herein in accordance with the law of the state of Missouri. United States v. Muniz, 374 U.S. 150, 153, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963); Brown v. United States, 419 F.2d 337 (8th Cir. 1969). Missouri law requires that a doctor

*633 . . . use and exercise that degree of care, skill, and proficiency which is commonly exercised by the ordinarily skillful, careful, and prudent physician and surgeon engaged in similar practice under the same or similar conditions. It is not sufficient that he may have possessed the requisite training and skill; he must also have used and applied it in the treatment of the plaintiff. Steele v. Woods, 327 S.W.2d 187, 196 (Mo.1959).
See also Brown v. United States, supra; Fisher v. Wilkinson, 382 S.W.2d 627, 630 (Mo.1964); Rauschelbach v. Benincasa, 372 S.W.2d 120, 124 (Mo.1963); Williams v. Chamberlain, 316 S.W.2d 505 (Mo.1958). An honest error of judgment in making a diagnosis is insufficient to support liability unless such mistake constitutes negligence. Williams, supra at 512; Fisher, supra at 632.
In the instant case, the doctors were not simply in error in reaching their diagnosis of plaintiff's condition. Instead, the physicians negligently failed to perform the tests and references which would have allowed them to make the diagnosis. The few tests that were ordered were either not performed or the tests were ignored. Basic tests were never ordered. Reference to another department was not accomplished. As a result, plaintiff's condition was allowed to deteriorate to a point where amputation resulted. These circumstances do not support a conclusion that the doctors were simply in error in their diagnosis. The Court must conclude that the doctors were negligent in failing to properly examine plaintiff in order to make that diagnosis. Cf., Hicks v. United States, 368 F.2d 626, 630 (4th Cir. 1966) ("Only if a patient is adequately examined, is there no liability for an erroneous diagnosis.").
Accordingly, judgment will be entered in plaintiff's favor in the sum of $95,000.00 at defendant's costs. 28 U.S.C. § 2412. The Court further concludes that counsel for plaintiff shall be allowed as reasonable attorney's fees the sum of $17,000.00 to be paid out of the amount awarded to plaintiff. 28 U.S.C. § 2678.