Sara McKERSIE, Plaintiff/Respondent,

v.

**BARNES HOSPITAL,**
Defendant/Appellant.

No. 66728.

Missouri Court of Appeals,
Eastern District,
Division Three.

Oct. 17, 1995.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Nov. 20, 1995.

Application to Transfer
Denied Jan. 23, 1996.

Thomas Blumeyer Weaver, Paul Nicholas Venker, Armstrong, Teasdale, Schlafly, Davis & Dicus, St. Louis, for appellant.

Mark I. Bronson, Newman & Bronson, St. Louis, for respondent.

GARY M. GAERTNER, Judge.

Appellant, Barnes Hospital ("Barnes"), appeals from entry of a judgment in the Circuit Court of the City of St. Louis in favor of respondent, Sara McKersie ("plaintiff"), on her medical malpractice action for injuries she suffered when her appendix ruptured and infected her right ovary and fallopian tube, requiring their surgical removal. We affirm.

We view the facts in the light most favorable to the verdict. On June 13, 1986, plaintiff, a twenty-nine year-old mother of one, visited her internist, Dr. John Grant, complaining of abdominal pain, vomiting, diarrhea, nausea and fever. Dr. Grant examined plaintiff and diagnosed her as having gastroenteritis or possibly appendicitis. Plaintiff declined Dr. Grant's suggestion to go to a hospital at that time. Later that evening, however, plaintiff's pain increased and she called Dr. Grant, who again instructed her to go to Barnes. Dr. Grant called the emergency room at Barnes to let the staff know plaintiff was coming in with possible appendicitis. Plaintiff arrived at the emergency room around 11:00 p.m.

Around 1:50 a.m. on June 14, 1986, Dr. Richard Johnston, an emergency room intern, examined plaintiff. Dr. Johnston employed a system of differential diagnosis: listing possible illnesses in order of seriousness and comparing them with the symptoms displayed by the patient. Dr. Johnston knew appendicitis was one of the primary concerns with respect to plaintiff. Dr. Johnston conducted pelvic and rectal examinations, took an X-ray, and performed blood tests. As noted in Dr. Johnston's report, plaintiff complained of the following: constant pain in her abdomen, localized in the right lower quadrant (where the appendix is located), fever, nausea, vomiting, diarrhea, and loss of appetite. Plaintiff also exhibited tenderness in the lower right abdominal quadrant deep in the pelvis, a mass on her right ovary, and an abnormally high white blood cell count ("WBC") of 13,200. Nearly all of the above are symptoms of appendicitis.

In the diagnosis section of his report, Dr. Johnston wrote plaintiff had gastroenteritis, and a possible luteal (ovarian) cyst. After examining plaintiff, Dr. Johnston phoned a resident gynecologist, who after hearing a summary of plaintiff's symptoms, agreed plaintiff had an ovarian cyst. Dr. Johnston also phoned Dr. Grant and told him of plaintiff's symptoms. However, Dr. Johnston apparently neglected to tell Dr. Grant that he (Johnston) was an intern who had never di-

agnosed appendicitis before; nor did he tell Dr. Grant of plaintiff's abnormally high WBC. Dr. Grant later testified in a deposition plaintiff's WBC would have raised a "red flag" to him with respect to the possibility of appendicitis, and he would have done things differently had he known of it. Dr. Grant also stated, had he known of Dr. Johnston's status as an intern with no experience with appendicitis, he would have requested that a senior resident experienced in diagnosing appendicitis examine plaintiff, or he would have gone there himself.

Dr. Johnston received Dr. Grant's permission to discharge plaintiff. Dr. Johnston told plaintiff she did not have appendicitis and was not going to need surgery, informed her she either had a severe case of the flu (gastroenteritis) or an ovarian cyst, suggested plaintiff talk with her gynecologist about the possible cyst problem, and also recommended she talk with Dr. Grant later that morning. Dr. Johnston discharged plaintiff around 3:00 a.m.

Plaintiff talked with Dr. Grant on the phone and was told by him to follow the instructions of the emergency room physician. Plaintiff contacted Dr. Durel, her gynecologist, who, believing her problem to be a cyst, recommended bed rest. Plaintiff's ailments did not subside, however, and on June 19, 1986, she experienced a vaginal discharge of a yellowish-green hue and foul odor. Understandably alarmed, plaintiff went to see Dr. Durel, who examined her and found a mass on her right ovary. An ultrasound was taken at St. Mary's Hospital, where Dr. Durel had plaintiff admitted as a patient. Plaintiff was administered intravenous antibiotics at the hospital for the next several days. On June 25, 1986, plaintiff started feeling worse. Exploratory surgery was performed, wherein it was discovered plaintiff's appendix had ruptured. Pus and bacteria from the rupture had spread into the pelvic area and completely infected plaintiff's right ovary and fallopian tube; as a result, both had to be removed, along with the ruptured appendix.

Plaintiff filed this medical malpractice action on June 10, 1988.[1] Plaintiff alleged Dr. Johnston's failure to diagnose her appendicitis constituted negligence and caused the eventual rupture of her appendix and consequent loss of her ovary and fallopian tube. A five-day trial was held in April of 1994.

Plaintiff's medical expert, Dr. Howard Schwartz, testified that, on the facts set out here, it was his opinion plaintiff's appendix had ruptured on the morning of June 14, 1986, shortly after she left Barnes' emergency room. Dr. Schwartz testified that many of the symptoms displayed by plaintiff at the emergency room and noted in Dr. Johnston's report were consistent with appendicitis but inconsistent with gastroenteritis: the constant pain localized in plaintiff's lower right abdominal quadrant (as opposed to generalized abdominal pain), the tenderness in the right adnexa, the vomiting, the loss of appetite, and the abnormally high white blood cell count. According to Dr. Schwartz, "this is a classic presentation for appendicitis."

Dr. Schwartz acknowledged that some of plaintiff's symptoms were also consistent with gastroenteritis (the fever and diarrhea) or luteal cysts (ovarian mass). However, Dr. Schwartz stated that Dr. Johnston's diagnosis would require two different illnesses to explain all her symptoms, while "one common disease [appendicitis] would explain it all." Dr. Schwartz testified that, as a whole, plaintiff's symptoms were more consistent with appendicitis. According to Dr. Schwartz, in light of the symptoms of appendicitis displayed by plaintiff, its relatively common occurrence, and its seriousness if left untreated, Dr. Johnston should have erred on the side of caution and sent plaintiff to the operating room for surgery. Dr. Schwartz opined that, by failing to diagnose plaintiff's appendicitis and failing to admit plaintiff under the care of a surgeon who would have taken her appendix out in a timely fashion, Dr. Johnston did not exercise the degree of skill and learning ordinarily used by members of the profession under the same or

---

1. Plaintiff's husband, originally a co-plaintiff, dismissed his claim for loss of consortium prior to trial.

similar circumstances, and failed to meet the expected standard of care.

Finally, Dr. Schwartz testified that because she lost her right ovary and fallopian tube, plaintiff "would have a diminished chance of reproducing, of having another child." On cross-examination, however, Dr. Schwartz stated plaintiff was still "more likely than not" capable of conceiving with the remaining ovary and fallopian tube, and agreed nothing indicated an "extra problem" as to conception. For her part, plaintiff testified she was "fearful of conceiving" and having another cesarean section performed in the same area where the appendectomy had been performed. Plaintiff also testified to "going through a grieving process of losing a part of my body, and especially my reproductive system."

Barnes' motion for a directed verdict at the close of the evidence was denied. At the end of trial, plaintiff dismissed the other defendants named in her petition (her gynecologist Dr. Justin Durel, the Shaner, Durel & Blaskiewics, Inc. medical group, and St. Mary's Hospital) and submitted the case as to Barnes only.[2] On April 15, 1994, the jury returned a verdict awarding plaintiff $624,000 in damages, itemized as $314,000 in past non-economic damages and $310,000 in future non-economic damages. The trial court reduced this award to $474,000. Barnes' motions for judgment notwithstanding the verdict, for a new trial, and for remittitur were denied. This appeal followed.

■ For its first point on appeal, Barnes contends the trial court erred in overruling its motions for directed verdict and for judgment notwithstanding the verdict. Barnes argues that under the "honest error of judgment" rule, plaintiff failed to make a submissible claim of negligence for failure to diagnose her appendicitis. In reviewing rulings on motions for directed verdict and judgments notwithstanding the verdict, we view the evidence in the light most favorable to plaintiff, giving the prevailing party the benefit of all reasonable inferences and disregarding evidence unfavorable to the jury's verdict. *Washington by Washington*

*v. Barnes Hosp.*, 897 S.W.2d 611, 615 (Mo. banc 1995). A trial court may not withdraw the case from the jury unless there is no room for reasonable minds to differ. *Id.*

■ In Missouri, "[a]n honest error of judgment in making a diagnosis is insufficient to support liability unless such mistake constitutes negligence." *Doss v. United States*, 476 F.Supp. 630, 633 (E.D.Mo.1979). *See also Williams v. Chamberlain*, 316 S.W.2d 505, 512 (Mo.1958); *Fisher v. Wilkinson*, 382 S.W.2d 627, 632 (Mo.1964). "The mere fact that a physician makes an incorrect diagnosis is no basis for a malpractice action. The patient has the burden of proof to show that the diagnosis was incorrect and also, that the incorrect diagnosis was the result of the physician's negligence." *Sibert v. Boger*, 260 S.W.2d 569, 571 (Mo.1953). To find such negligence in the misdiagnosis of a patient, there must be evidence of the physician's failure to use the appropriate degree of skill and learning ordinarily used and exercised by other physicians in the same or similar circumstances. *Williams*, 316 S.W.2d at 510.

Here, there was evidence in the record to support a verdict in favor of plaintiff. The evidence shows that Dr. Johnston was aware appendicitis was an obvious possibility and that plaintiff displayed symptoms of appendicitis, yet Dr. Johnston failed to diagnose it and failed to send plaintiff to surgery. Dr. Schwartz unequivocally asserted that Dr. Johnston fell short of the degree of skill and learning ordinarily used by members of the profession under same or similar circumstances.

Barnes makes much of Dr. Schwartz's statement that the "only way you can make the diagnosis [of appendicitis] is to do the operation and take it out." According to Barnes, plaintiff's own evidence showed no diagnosis was possible until surgery was performed, and therefore the judgment for plaintiff held Dr. Johnston to "a standard of care that no doctor could obtain—diagnosing appendicitis ... without performing surgery." Barnes takes Dr. Schwartz's testimony out of context. Dr. Schwartz testified

2. Neither Dr. Johnston nor Dr. Grant were named as defendants in the petition.

elsewhere that the only way to be *absolutely certain* a patient had appendicitis was to operate. Dr. Schwartz's meaning was clear: no doctor would ever be absolutely certain a patient has appendicitis until surgery was performed. It is also clear Dr. Schwartz was not holding Dr. Johnston to such a standard. Rather, Dr. Schwartz's criticism was based on Dr. Johnston's discounting appendicitis as even being a possibility despite plaintiff's symptoms, and his resultant determination that no surgery was needed. Taking all the facts and inferences in favor of plaintiff and disregarding adverse evidence, we find plaintiff made a submissible claim of negligence with respect to Dr. Johnston's misdiagnosis of her condition. Barnes' first point is denied.

■ For its second point on appeal, Barnes contends the evidence did not support the submission of a future damages instruction to the jury. Barnes argues the future damages resulting from Barnes' alleged negligence were not shown to a reasonable certainty, in that the evidence showed plaintiff more likely than not suffered no adverse future effects from the loss of her right ovary and fallopian tube.

The trial court submitted the following instruction:

> If you find in favor of plaintiff, then you must award plaintiff such sum as you believe will fairly and justly compensate plaintiff for any damages you believe she sustained and is reasonably certain to sustain in the future as a direct result of the occurrence mentioned in the evidence.

The above instruction is based on MAI 21.03 [1988 New]. The phrase "and is reasonably certain to sustain in the future" may be added if supported by the evidence. MAI 21.03, Notes on Use 1 [1990 Revision]. Barnes objected to this instruction at the instruction conference, arguing there was no

evidence of future damages as it was not shown that plaintiff was unable to conceive as a result of the loss of her right ovary and fallopian tube. The court overruled the objection.

■ To receive an award of future damages, the plaintiff must adduce competent medical evidence showing future physical conditions of the kind asserted as damages will result from the original injury. *Zoeller v. Terminal Railroad Ass'n of St. Louis,* 407 S.W.2d 73, 78 (Mo.App.St.L.1966). The degree of probability of such damages must be greater than a mere likelihood; it must be reasonably certain to ensue. *Id.* Consequences which are contingent, speculative, or merely possible may not be considered. *Id.* Future damages are a matter of medical opinion and generally require expert medical testimony. *See Smith v. Sayles,* 637 S.W.2d 714, 718 (Mo.App.W.D.1982).

■ In determining whether there was evidence sufficient to support the submission of a future damage instruction to a jury, we view the evidence in the light most favorable to the offering party, giving that party the benefit of all favorable inferences. *Porter v. Bi–State Development Agency,* 710 S.W.2d 435, 437 (Mo.App.E.D.1986). Here, plaintiff suffered the permanent loss of her right ovary and fallopian tube. Plaintiff's theory of recovery for future damages was based on the impact this loss had on her ability to conceive.[3] There was expert testimony from Dr. Schwartz that plaintiff's capacity for conceiving another child was diminished due to the loss of her ovary and fallopian tube. There was also testimony from plaintiff on the effect this loss had on her emotionally. We see no error in the trial court's submission of the future damages instruction. Barnes' second point is denied.

■ For its final[4] point on appeal, Barnes argues the submission of the verdict director

---

**3.** Barnes cites *Hoffman v. St. Louis Public Service Co.,* 255 S.W.2d 736 (Mo.1953), in which the Missouri Supreme Court, in affirming an award of damages to a woman who suffered the loss of an ovary after she fell on a bus, noted that the "possibility of plaintiff losing her other ovary and thereby becoming sterile" did not constitute an element of damages for which she could recover. *Id.* at 742. However, plaintiff's claim for future

damages was not based on this ground, but on the diminution of her ability to conceive.

**4.** Barnes originally raised a fourth point on appeal challenging the trial court's denial of its motion for remittitur, which it has since withdrawn.

to the jury was error because it was unsupported by sufficient evidence and inconsistent with the theory of liability presented by plaintiff at trial.[5] Plaintiff asserts this point was not preserved for review because Barnes did not object to the verdict director on these grounds at trial.

This case was governed by the new version of Rule 70.03, which became effective January 1, 1994. Rule 70.03 provides in part:

> Counsel shall make specific objections to instructions considered erroneous. No party may assign as error the giving or failure to give instructions unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection.

Barnes' only objection to the verdict director prior to its submission to the jury was that the instruction's use of the phrase "failed to diagnose" was "argumentative." Barnes did not specifically object to the verdict director at trial on either of the grounds presented here on appeal. "Where an alleged error relating to an instruction differs from the objections made to the trial court, the error may not be reviewed on appeal." *Seidel v. Gordon A. Gundaker Real Estate Co.*, 904 S.W.2d 357, 364 (Mo.App.E.D.1995). Barnes' contentions of error with respect to the verdict director were not preserved for appeal. Barnes' final point is denied.

Based on the foregoing, the judgment of the trial court is affirmed.

SMITH, P.J., and RHODES, J., concur.

---

**5.** The verdict director, based on MAI 21.01 [1988 Revision], ordered the jury to issue a verdict in favor of plaintiff if it believed Dr. Johnston failed to diagnose appendicitis, was thereby negligent, and this negligence caused damage to plaintiff.