Melba DOTSON, Plaintiff/Appellant,

v.

Harley J. HAMMERMAN, M.D., Radiologic Imaging Consultants, a corporation, Cardiac, Thoracic & Vascular Surgery, Inc., a corporation, and K. James, M.D., Defendants/Respondents.

No. 69056.

Missouri Court of Appeals, Eastern District, Division Two.

Oct. 29, 1996.

Richard L. Hughes, Mogab & Hughes, St. Louis, for plaintiff/appellant.

Robert A. Wulff, Amelung, Wulff & Willenbrock, Edward V. Crites, Kortenhof & Ely, Laurie S. Wright, Moser & Marsalek, P.C., St. Louis, for defendants/respondents.

CRANE, Judge.

In this medical malpractice action plaintiff Melba Dotson appeals from the trial court's judgment in defendants' favor. The trial court sustained a motion for directed verdict after plaintiff's opening statement filed by defendant Harley Hammerman, M.D. and his employer, defendant Radiologic Imaging Consultants, Inc. (Radiologic). The jury returned a verdict in favor of the remaining defendants, Cardiac, Thoracic & Vascular Surgery, Inc. (Cardiac) and Kathleen James, M.D. On appeal plaintiff contends that the trial court erred in sustaining the motion for directed verdict and in denying her motion for new trial against all defendants on the basis of that error. We affirm.

The malpractice allegations arose from plaintiff's claim that each defendant's negligence had led to her having an unnecessary bilateral mastectomy. She brought separate counts against each of the medical providers. Count one sought recovery from Dr. Hammerman, a radiologist, and his employer, Radiologic. She alleged that Dr. Hammerman reviewed a CT scan of plaintiff and

4. That after reviewing the CT scan, Defendant Dr. Hammerman incorrectly diagnosed plaintiff as having a "longitudinal separation of the sternum."

5. That in diagnosing plaintiff's condition as set out in Paragraph 4 above, Dr. Hammerman negligently (a) misdiagnosed the healing status of plaintiff's sternum, and (b) made a diagnosis which was equivocal, misleading and confusing.

In Count two she alleged that the Cardiac surgeons diagnosed that she was suffering from sternal dehiscence and advised her to have a bilateral mastectomy to improve the chances of successful repair of her sternal wound; however, subsequent surgery showed no sternal dehiscence. In Count three she alleged that Dr. James performed the mastectomy which was unnecessary because plaintiff's sternum was healing and she was not dehisced.

In his opening statement counsel for plaintiff outlined plaintiff's medical history as follows. In 1988 the Cardiac surgeons performed open heart surgery on plaintiff during which her sternum was split apart and wired together. After that surgery her sternum pulled apart, a condition known as sternal dehiscence. The Cardiac surgeons, who diagnosed the dehiscence, advised her that the weight of her breasts was causing the sternum to dehisce. They suggested that if her sternum did not heal she might have to undergo a mastectomy to facilitate healing. On March 21, 1989 one of the Cardiac surgeons performed a second surgery to rewire the sternum and repair the dehiscence. After that surgery plaintiff consulted her personal physician, Dr. James, about a breast problem and her sternal wound. On her next visit, May 9, 1989, she told Dr. James that, while carrying out the garbage, she felt a pull in her chest and was now having pain at the incision site. Dr. James thought that she may have had another dehiscence and advised her to see the Cardiac surgeons about that possibility. Plaintiff saw one of the Cardiac surgeons. He wrote an order to Radiologic requesting a CT scan to "RO [rule out] sternal dehiscence." Dr. Hammerman was the radiologist at Radiologic who read the films pursuant to this order.

Counsel then stated:

Dr. Hammerman never sees—and it's thoroughly appropriate—he never sees the patient. Dr. Hammerman gets no more information about what he was or was not to look for than this note. Dr. Hammerman is not told by any of the doctors in the cardiothoracic group, who order this, other than what is said here. He is never told that seven weeks before this, this lady's chest is opened up and she is rewired, her sternum is reapproximated and she's rewired.

In other words, Dr. Hammerman is not told that this lady is only seven weeks post sternum surgery. He doesn't know that. Now what happens next then is Dr. Hammerman reads the film, and Plaintiff's Exhibit 3 is his diagnosis.

Exhibit 3 was a blow-up of Dr. Hammerman's report. The record reflects it was marked and referred to in opening statement. It reads as follows:

A CT scan of the sternum was performed. Multiple wire sutures are seen surrounding the sternum consistent with the patient's prior sternotomy. A longitudinal separation of the sternum is seen throughout its entire length consistent with the clinical impression of a sternal dehiscence. There is no soft tissue abnormality or inflammatory change seen about the separation to suggest a diagnosis of infection.

IMPRESSION Findings as above consistent with the clinical diagnosis of dehiscence.

Plaintiff's counsel, referring to the report, continued:

He finds a longitudinal separation of the sternum throughout its entire length consistent with a clinical impression of sternal dehiscence. [colloquy with court omitted.] His impression is: Findings as above consistent with—and the article is important here—'the' clinical diagnosis of dehiscence. The record is clear that at this time, other than Dr. James, who has got a question mark and has said she thought there might be a clinical dehiscence, that nobody has made a clinical diagnosis of dehiscence.

Subsequently the Cardiac surgeons determined that plaintiff had a dehiscence and advised Dr. James that, if there was a dehiscence, a mastectomy should be performed

before rewiring surgery. Dr. James consulted a plastic surgeon who recommended a mastectomy, rather than a breast reduction, because of plaintiff's health history. On May 21, 1980 Dr. James performed the mastectomy. On June 6, one of the Cardiac surgeons operated on plaintiff to rewire the sternum but found that it was healing.

Plaintiff's counsel summarized the case as follows: "So, what this case is all about is about a series of misadventures where nobody really did what was needed to be done. The clinical exam for dehiscence." He had advised the jury: "There will be testimony from, I'm sure, all of the doctors in this case that you can't make the diagnosis of dehiscence based on history or what it looks like. You have to palpate." He further stated:

Dr. Bassin will tell you that you have to do a clinical exam to make this diagnosis (of "sternal dehiscence"). You have to palpate the chest. He'll tell you that without that exam you can't make the diagnosis, and seven weeks after surgery he'll tell you that the CT doesn't mean anything, because the bone, as it's wired together, can heal on occasion with some soft tissue. Scar tissue can cause the healing, so you could—it looked like—might look like it's apart, but it isn't.

Plaintiff's counsel next told the jury that her expert, Dr. Sheer, would testify that "the CT film, which you'll see, shows a separation, but the separation is a natural separation consistent with healing, it doesn't mean anything, ..." (objection to remainder of sentence sustained).

After plaintiff's opening statement, Dr. Hammerman's attorney asked for a bench conference at which he asked plaintiff's attorney on the record if he wished to add to his opening statement. Plaintiff's attorney explained that his theory of negligence against Dr. Hammerman was that he had diagnosed her condition without being aware of her clinical history. Plaintiff's attorney told the judge that "[t]he question of separation of the sternum, there has never been an argument about that." Dr. Hammerman's attorney moved for a directed verdict on the grounds that plaintiff's attorney admitted that the diagnosis of sternal dehiscence could

only be made clinically, not by reading a CT scan, and that Dr. Hammerman's finding of a longitudinal separation was accurate. The trial court took the request under advisement and heard all the defendants' opening statements. The court then heard the parties' arguments on the directed verdict motion and granted the motion.

■ For her first point plaintiff asserts that the trial court erred in directing a verdict in favor of Dr. Hammerman and Radiologic at the close of opening statements because plaintiff did not admit an inability to prove her case against those defendants.

As a general matter, trial courts are reluctant to direct a verdict at the close of plaintiff's opening statement. *Politte v. Union Electric Company,* 899 S.W.2d 590, 592 (Mo. App.1995). The opening statement is usually only an outline of anticipated proof, not a detailed statement, and counsel is not required nor expected to recite every detail of evidence to be offered. *Brouk v. Brueggeate,* 849 S.W.2d 699, 702 (Mo.App.1993); *Gibson v. Grant,* 766 S.W.2d 706, 709 (Mo.App.1989). Generally, a trial court may direct a verdict at the close of plaintiff's opening statement in two situations:

(1) when counsel makes an admission which affirmatively demonstrates as a matter of law that plaintiff has no cause of action or is not entitled to recover on his cause of action, or

(2) where the facts recited in the opening statement, if proved, do not, as a matter of law, constitute enough to make a submissible case to go to the jury.

*Zabol v. Lasky,* 498 S.W.2d 550, 553–54 (Mo. 1973).

■ However, the second situation is limited. The mere insufficiency of the opening statement to recite facts which show that plaintiff's anticipated evidence would, as a matter of law, present a submissible case, is not, standing alone, a sufficient justification to stop the case at that stage and direct a verdict for the defendant. *Zabol,* 498 S.W.2d at 554; *Hays v. Missouri Pacific Railroad Co.,* 304 S.W.2d 800, 804–05 (Mo.1957). In that situation a directed verdict for defendant is only appropriate when it affirmatively

appears that the whole of plaintiff's case has been fully and completely set forth in the opening statement and it clearly appears, as a matter of law, that proof of the recited facts, together with all reasonable inferences in plaintiff's favor, would not result in a submissible case. *Politte*, 899 S.W.2d at 592; *Brouk*, 849 S.W.2d at 702; *Gibson*, 766 S.W.2d at 709–10.

▪ In that event the trial court may direct a verdict for defendant in order to avoid the unnecessary and useless procedure of taking testimony which is known in advance to be insufficient. *Gibson*, 766 S.W.2d at 710; *Hays*, 304 S.W.2d at 804. This action should be taken only after counsel has been given the opportunity, after the motion for directed verdict has been made, to correct or add to the opening statement. *Gibson*, 766 S.W.2d at 710; *Zabol*, 498 S.W.2d at 554.

▪ In a medical malpractice case, plaintiff must show the physician's acts or omissions 1) failed to meet the requisite standard of care, 2) were performed negligently, and 3) caused the claimed injury or condition. *MacDonald v. Sheets*, 867 S.W.2d 627, 630 (Mo.App.1993). An honest error of judgment in making a diagnosis is insufficient to support liability unless that mistake constitutes negligence. *McKersie v. Barnes Hosp.*, 912 S.W.2d 562, 565 (Mo.App.1995); *Fisher v. Wilkinson*, 382 S.W.2d 627, 632 (Mo.1964); *Williams v. Chamberlain*, 316 S.W.2d 505, 512 (Mo.1958). The patient must first show an incorrect diagnosis and, next, that the incorrect diagnosis was the result of the physician's negligence. *McKersie*, 912 S.W.2d at 565; *Sibert v. Boger*, 260 S.W.2d 569, 571 (Mo.1953). To find such negligence in the misdiagnosis of a patient, there must be evidence of the physician's failure to use the appropriate degree of skill and learning ordinarily used and exercised by other physicians in the same or similar circumstances. *McKersie*, 912 S.W.2d at 565.

▪ Paragraph 4 alleges that Dr. Hammerman incorrectly diagnosed plaintiff as having a longitudinal separation of the sternum. Paragraph 5 alleges:

> That in diagnosing plaintiff *as set out in paragraph 4 above* Dr. Hammerman negli-

gently (a) misdiagnosed the healing status of plaintiff's sternum; and (b) made a diagnosis which was equivocal, misleading and confusing. [Emphasis added]

The only diagnosis set out in paragraph 4 is the diagnosis that plaintiff had a longitudinal separation of the sternum. Thus the only act or omission complained of is that the diagnosis of a longitudinal separation of the sternum was incorrect. The petition alleges that this incorrect diagnosis was a misdiagnosis of the sternum's healing status and was misleading and confusing. Accordingly, plaintiff's specific theory of negligence is that Dr. Hammerman incorrectly diagnosed the sternum as separated. In her opening statement plaintiff affirmatively admitted, and in her brief on appeal plaintiff has conceded, that the diagnosis of a longitudinal separation of the sternum was correct. This affirmative admission demonstrates as a matter of law that plaintiff is not entitled to recover on her pleaded cause of action.

Plaintiff contends that paragraph 5 is not limited to the finding of the separation but refers to Dr. Hammerman's whole report. She argues that her theory of negligence is that Dr. Hammerman failed

> to indicate that his finding of longitudinal separation is consistent with *either* a "dehiscence" or a 'delayed healing' of the sternum and to explain the reasons for the 'longitudinal separation' which constitutes negligence. This failure by Dr. Hammerman to *clarify* his diagnosis led the other physicians to conclude that there was indeed a second 'dehiscence' of the sternum following the March 21, 1989 rewiring surgery as opposed to a slow healing.

In his report Dr. Hammerman stated that the longitudinal separation of the sternum was consistent with the clinical diagnosis of sternal dehiscence. Plaintiff does not contend that this conclusion was erroneous. Rather, she contends that Dr. Hammerman should also have stated that the separation was consistent with other conditions. This theory, which admits the existence of a separation, was not within the fair purview of the pleadings which charged Dr. Hammerman with incorrectly diagnosing plaintiff as having a separation. Further, this theory is

inconsistent with the facts admitted in plaintiff's opening statement.

The opening statement clearly established that the diagnosis of sternal dehiscence could only be made clinically. According to the opening statement, Dr. Hammerman's sole instruction from the Cardiac surgeons, who were in the process of diagnosing plaintiff's condition, was for a CT scan to "Rule out sternal dehiscence. That's what he's told to do." The order did not ask for other possible diagnoses. In his report Dr. Hammerman said the longitudinal gap seen on the CT scan was consistent with the clinical diagnosis of sternal dehiscence. Therefore, sternal dehiscence could not be ruled out by the CT scan. The Cardiac surgeons not only did not ask Dr. Hammerman to suggest other possible diagnoses, they also did not supply him with the medical and surgical history plaintiff asserted would be necessary to suggest other explanations for the gap in plaintiff's sternum. The affirmative facts set forth in the opening statement simply do not support the unpleaded theory that Dr. Hammerman was negligent in not suggesting alternative explanations for this gap.

The trial court did not err in sustaining Dr. Hammerman's motion for directed verdict at the close of opening statements.

For her second point plaintiff contends that the trial court's error in directing a verdict against Dr. Hammerman and Radiologic mandates a new trial against all defendants. Since we have found no error, this point is moot.

The judgment of the trial court is affirmed.

GERALD M. SMITH and KAROHL, JJ., concur.